## In re HALLADJIAN et al.

(Circuit Court, D. Massachusetts. December 24, 1909.)

**1. ALIENS (§ 68*)—DUTY—FILING NATURALIZATION PETITIONS.**

Clerks of the federal courts are not subject to the instruction by federal district attorneys or by the United States itself as a party to a judicial proceeding, but are required to file naturalization petitions which contain all proper allegations, though in their judgment the applicant, because of his color, race, or other disqualification, may not be entitled to citizenship.

[Ed. Note.—For other cases, see Aliens, Cent. Dig. § 144; Dec. Dig. § 68.*]

**2. ALIENS (§ 61*)—NATURALIZATION—"FREE WHITE PERSONS"—ARMENIANS.**

Rev. St. § 2169 (U. S. Comp. St. 1901, p. 1333), relating to naturalization, provides that the title shall apply to aliens, being "free white persons," and to persons of African nativity and descent. *Held,* that the word "white" was used to classify the inhabitants and to include all persons not otherwise classified, not as synonymous with "European," there being in fact no "European" or "white" race as a distinctive class, or "Asiatic" or "yellow" race, including substantially all the people of Asia; and hence the term "free white persons" included Armenians born in Asiatic Turkey and on the west side of the Bosphorus.

[Ed. Note.—For other cases, see Aliens, Cent. Dig. §§ 119, 120; Dec. Dig. § 61.*]

**3. ALIENS (§ 61*)—NATURALIZATION—"RACE."**

The term "race" primarily means an ethnical stock; a great division of mankind having in common certain distinguishing physical peculiarities, constituting a comprehensive class appearing to be derived from a distinct primitive source. A second definition is a tribal or national stock; a division or subdivision of one of the great racial stocks of mankind, distinguished by minor peculiarities. The word "race" connotes descent.

[Ed. Note.—For other cases, see Aliens, Cent. Dig. §§ 119, 120; Dec. Dig. § 61.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Application by four Armenians, named, respectively, Halladjian, Ekmakjian, Mouradian, and Bayentz, for naturalization. Granted.

Petitioners, pro sese.

James Farrell, Asst. U. S. Atty.

Moorfield Storey and J. Grant Forbes, amici curiæ.

LOWELL, Circuit Judge. Four petitioners presented themselves for naturalization. They were examined, and, except as stated below, were shown to be duly qualified for citizenship. All testified that they were Armenians by race. Halladjian was born at Aintab, Ekmakjian at Dikranagerd or Diarbekir, and Mouradian at Adana, all in Asiatic Turkey. Bayentz was born in a suburb of Constantinople on the west side of the Bosphorus. I find that all were white persons in appearance, not darker in complexion than some persons of north European descent traceable for generations. Their complexion was lighter than that of many south Italians and Portuguese. The United States opposed the naturalization of all these persons upon the ground that they were not "free white persons," within the purview of Rev. St. § 2169 (U. S. Comp. St. 1901, p. 1333). The assistant district attorney submitted a brief in opposition to the petitions, and referred the court to certain letters written by the Chief of the Bureau of Naturalization; the argument contained in the letters being adopted by the United States as its own. The court has also been aided by a brief filed in support of the petitions by two members of the bar as amici curiæ, and it has welcomed notes and references which other persons have furnished it, attracted by the importance of the case.

Brief mention should be made here of a sentence found in one of the letters referred to which was addressed to an assistant district attorney of the United States:

"This office * * * must request * * * that you will oppose the granting of naturalization to Hindoos or East Indians, and that you will instruct the clerks of courts in your district to refuse to accept declarations of intention or to file petitions for naturalization upon behalf of such aliens."

The second request was made without due consideration. The clerks of the federal courts are not subject to instruction by district attorneys, or by the United States itself, as a party to a judicial proceeding. That a clerk should refuse to file a petition for naturalization which contains all proper allegations, because of his judgment of the color, race, or other qualification of the petitioner, would violate the clerk's official duty. The clerk may, as an act of personal kindness, call the statute of 1882 to the attention of one who appears plainly to be a Chinaman, and may suggest that his petition will almost certainly be dismissed; but, if the petitioner persists, the petition must be filed. The act of 1882 (Act May 6, 1882, c. 126, § 14, 22 Stat. 61 [U. S. Comp. St. 1901, p. 1333]), forbids the naturalization of Chinamen; it does not deny them access to a court.

Rev. St. § 2169, reads as follows:

"The provisions of this title [Naturalization] shall apply to aliens being free white persons, and to aliens of African nativity, and to persons of African descent."

The phrase "free white persons" dates from the earliest federal statute regulating naturalization. Act March 26, 1790, c. 3, 1 Stat. 103, provided for the naturalization of "any alien, being a free white person." The phrase was repeated in Act Jan. 29, 1795, c. 20, 1 Stat. 414, and in Act April 14, 1802, c. 28, 2 Stat. 153. The same language was used in sundry later modifications of the law. Act March 22, 1816, c. 32, 3 Stat. 259; Act May 26, 1824, c. 186, 4 Stat. 69; Act May 24, 1828, c. 116, 4 Stat. 310. Act July 17, 1862, c. 200, § 21, 12 Stat. 597, provided for the naturalization of "any alien," being an honorably discharged soldier, without qualification, and seems thus to have provided that any person of the class described might be naturalized, irrespective of color. He who had rendered military service was deemed worthy of citizenship. In the earlier statutes the requirement of white color was expressed at the beginning of the sections which provided generally the conditions and methods of naturalization, sections which correspond to Rev. St. §§ 2165–2168 (U. S. Comp. St. 1901, pp. 1329–1333). Act July 14, 1870, c. 254, § 7, 16 Stat. 256, permitted the naturalization of "aliens of African nativity and * * * persons of African descent." Rev. St. 1873, §§ 2165–2168, omitted mention of "free white persons," thus opening naturalization to all aliens. Notwithstanding this universal inclusion, yet the special inclusion of Africans made by the act of 1870 was expressly, though needlessly, continued in section 2169, as follows:

"The provisions of this title [Naturalization] shall apply to aliens of African nativity and to persons of African descent."

The intent of Congress in passing section 2169 in its original form was to insure by express inclusion the right of Africans to be naturalized like all other persons. By Act Feb. 18, 1875, c. 80, 18 Stat. 318, passed "to correct errors and to supply omissions in the Revised Statutes," section 2169 was amended to take its present form, thus again limiting naturalization to (1) free white persons, and (2) Africans within the act of 1870. The broad phrase "any alien" was left unchanged in sections 2165–2168, and its meaning therein was defined and cut down by section 2169. This is the most reasonable construction of section 2169 in its present form. To make the additional express inclusion of whites by the amendment of 1875 operate to exclude all other persons from naturalization is an awkward construction, but seems inevitable. By Act May 6, 1882, c. 126, § 14, 22 Stat. 61, the courts were forbidden to naturalize Chinese.

With the freedom of the petitioners the court need not concern itself. All applicants for naturalization, inasmuch as they reside in the United States, are necessarily free. Since 1790 the requirement of white color in persons naturalized has been expressed in the same words (except between 1873 and 1875). Africans qualified except as to color may now be naturalized, indeed, though they are not white, and Chinese are altogether excluded, whether they are white or not. These exceptions are created by express provisions of statute limited, respectively, to Africans and Chinese. Other applicants, qualified except as to color, may now, as always, be naturalized if they are "white," and may not be naturalized if they are not "white." These petitioners

are neither Chinamen nor Africans of any sort, and the court has here to decide whether they are white or not.

The United States contends that the words "white persons" should be construed to mean Europeans and persons of European descent. Even this definition is ambiguous. Bayentz is a European by birth and previous residence, yet the United States contends that his petition should be dismissed because he does not belong to a race which is "European or white." The United States contends that the proper distinction is not one of mere nativity or of personal color; that "white" is the equivalent of "European," and is used to—

"describe the variations of domicile or origin which are so closely associated with the mental development of a people." "European, or its analogous term, white man, * * * is intended, not merely to describe the local habitat of the person to whom applied, but as a brief and convenient designation descriptive of the prevailing ideals, standards, and aspirations of the people of Europe."

These phrases suggest that the education and intelligence of the petitioner furnish part of the test of his statutory color, but the United States does not thus interpret its own language above quoted. It insists that a petitioner, in order to be naturalized, must be European by race. As the argument is based upon consideration of race, the meaning of that word must be examined with care.

"Race" is defined in the "Century Dictionary" primarily as:

"An ethnical stock: a great division of mankind having in common certain distinguishing physical peculiarities, and thus a comprehensive class appearing to be derived from a distinct primitive source."

A secondary definition is:

"A tribal or national stock; a division or subdivision of one of the great racial stocks of mankind, distinguished by minor peculiarities: as, the Celtic race; the Finnic race is a branch of the Mongolian; the English, French, and Spaniards are mixed races."

The word "race" connotes descent. Persons of wholly different ancestry, however much they are alike in all other respects, are not deemed to be of the same race, while persons of the same ancestry, however dissimilar in other respects, are deemed to belong to the same race. The common ancestry which determines race is necessarily remote, and beyond reach of ordinary genealogy. The offspring of mixed marriages within two or three generations are not here in question. Inasmuch as race connotes descent, the names applied to races are not usually derived from the country now inhabited by the people composing the race, unless that people has long been stationary. Thus we speak of the Anglo-Saxon race, the Teutonic, the Celtic, the Slavonic, the Caucasian, the Mongolian, the Hebrew, the negro, more commonly than of the Swiss race, the Austrian, the Spanish, or the Egyptian. In the rarer cases where the latter names are used, the usage is commonly by figure and analogy. Only where a people has remained without considerable emigration or immigration, substantially unmixed, in the same country for a very long time, do racial and geographical boundaries coincide. The inhabitants of no considerable part of Europe belong to a race thus unmixed. In what is called by

analogy a "mixed race," the cross must have been ancient, and the hybrid must have persisted without much later crossing. In nearly all Europe the mixture is not only ancient, but has continued to modern times, and even to the present day. Where there is least mixture, the departure is farthest from a single type. The Cossack of the Don and the Norwegian differ almost as much in physical appearance as in "prevailing ideals, standards, and aspirations." The United States cites no authority for the use of the term "European race," save a few expressions in judicial opinions used mostly by the way.

Even if we grant for the sake of the argument that it is proper to speak of the British race, the Hungarian, and the Russian, even if these may be designated as European races, yet to classify them as belonging to a single race, called "European or white," is contrary to ordinary usage. When Linnaeus wrote of the European race, he intended something different from the contention of the United States. He made the European race anciently inhabit Europe and the nearer parts of Asia and Africa. He was not writing of modern times nor of geographical limits.

The United States contends, further, that there is an Asiatic or yellow race, to which belong substantially all Asiatics, including these petitioners. No authority to support this theory is cited by reference to history, to ethnological theory, either ancient or modern, or to physical appearance. In their appearance, some or all of the petitioners would pass undistinguished in western Europe. They are no darker than many western Europeans, and they resemble the Chinese in feature no more than they resemble the American aborigines. The court cannot agree with the United States that:

"Without being able to define a white person, the average man in the street understands distinctly what it means, and would find no difficulty in assigning to the yellow race a Turk or Syrian with as much ease as he would bestow that designation on a Chinaman or a Korean."

A Hindoo, also referred to in the argument of the United States, differs in color no less from a Chinaman than from an Anglo-Saxon, and in other obvious physical characteristics he much more resembles the latter.

If we do not speak generally of an Asiatic or yellow race, which includes "substantially all the aboriginal peoples of Asia," the difficulty is greater in applying this name to the present inhabitants of western Asia and the eastern shores of the Mediterranean. The history of that country is known to us for 2,500 years, and nearly every people of Europe and Asia has inhabited it in whole or in part. So far as the ancient Greeks should be classified as one race, that race inhabited both shores of the Ægean. Persians, Romans, Gothic barbarians of many sorts, Saracens, French, Venetians, Hebrews, Ottoman Turks, have ruled within it at one time or another, and slaves from all parts of Europe, Asia, and Africa were brought there and mixed their blood with that of the earlier population. A Burgundian, traveling in Syria shortly before the conquest of Constantinople, casually noted in that country the presence, as inhabitants, of Florentines, Genoese, Catalans, Venetians, French, Circassians, Saracens, Turkomans, Arabs, Persians, Tartars, Moors, Greeks, and Hebrews. "Le Voyage d'Outre

Mer" of Bertrandon de la Broquière. What was then true of Syria was generally true of Asia Minor and of both shores of the Bosphorus; and the mixture of races thus suggested has gone on during the last 500 years. Doubtless religious and racial quarrels have checked intermarriage, and racial types have persisted more commonly than we might suppose, especially in Armenia proper. But in Asia Minor and in European Turkey blood has mixed otherwise than by voluntary intermarriage. History does not show, as suggested by the United States, that:

"The Turks have never commingled with Europeans, nor can it be said with any truth that they are descendants of Europeans."

For many centuries the Turks have ruled in Europe and Asia over Christians of many names, and have employed Christians for many purposes. Thus Loredano, a Venetian admiral, wrote in 1416:

"On board the captured [Turkish] ships we found Genoese, Catalans, Provençals, Sicilians, and Candiots, and these we cut to bits. * * * George Calergi, a rebel against your Serenity, I ordered to be quartered on the poop of my own ship. This will be a warning to Christians not to take service with the Turk again."

Yet the warning remained unheeded. The left wing of the Turkish fleet at Lepanto was commanded by a Calabrian, who had become Dey of Algiers. Instances of this sort were numberless, and the so-called renegades were not celibates. The Turks, indeed, both socially and sexually, commingled with Europeans to an unusual degree. European mothers bore their children, European architects built their mosques, European generals commanded their armies, and it was charged against them as an act of extraordinary cruelty that they took from European families the most promising boys and brought them up to be Mohammedans and Turks. The Turks and the Saracens did not exterminate the people they conquered. Conversion to Mohammedanism and tribute were usually offered as alternatives to the sword.

To its classification by European and Asiatic races the United States makes an extraordinary exception, viz., the Hebrews. Their history is known for a long period. While absolute purity of blood is out of the question, they have sought with unusual strictness to maintain that purity for 2,000 years at the least. Notwithstanding the opinion of Prof. Ripley and others, both Hebrew history and an approximation to general type show that the Hebrews are a true race, if a true race can be found widely distributed for many centuries. Their origin is Asiatic. Yet the United States admits that they do not belong to the "Asiatic or yellow race," and that they should be admitted to citizenship. If "the aboriginal peoples of Asia" are excluded from naturalization, as urged by the United States, it is hard to find a loophole for admitting the Hebrew. Again, if Hindoos are to be excluded from naturalization, as contended by the United States, because many Englishmen treat them with contempt and call them "niggers," a like argument applies to those who have suffered most cruelly among all men on the earth from European hatred and contempt. In the application of its classification, the United States thus contradicts the principles upon which the classification depends.

It is misleading, therefore, to speak of a European race, of a European or white race to which substantially all inhabitants of Europe belong, or of an Asiatic race, of an Asiatic or yellow race which includes substantially all Asiatics. Furthermore the present inhabitants of western Asia have their racial descent so mixed that there are many individuals who cannot safely be assigned by descent to any one race, however comprehensive. If the statutory classification should be any wise rested upon "mental development," or upon "ideals, standards, and aspirations," as suggested by the United States, a reasonable modesty may well remind Europeans that the origin of their letters was in Phœnicia, the origin of much of their art in Egypt, that Asia Minor claimed, at least, the birthplace of the first great European poet, and that the Christian religion, which most Europeans believe to have influenced their civilization and ideals, was born in Palestine.

If, however, notwithstanding these considerations, we are compelled by statute to classify for the purposes of American naturalization every man living on the earth as a member of some one race, we shall find that the Armenians have always been classified in the white or Caucasin race, and not in the yellow or Mongolian. Ethnological theories have varied greatly and at short intervals. Color, language, the shape of the head, the kind of hair, and other characteristics have been made the basis of one classification or another. Their tradition makes Armenians descend from Japhet; their language is classed as Indo-European. This court cannot be expected in any reasonable time to get a thorough education in ethnology, especially in modern ethnological theories. Its information is got at second or third hand; but a casual examination of books on ethnology, standing together on the shelves of a large library, old and new, weighty and unimportant, shows complete agreement in the proposition that Armenians are to be classed as white or Caucasian, rather than as Mongolian or yellow. Figuier, Brace, Keane, Pickering, Brinton, Hutchinson, Jeffries, Pritchett, and Retzel, authors taken quite at random, all reach the same conclusion. This is true of Blumenbach, an influential author of the eighteenth century, and of Quatrefages and Huxley about a century later. Cuvier expressly included Armenians, as well as Hindoos, in the Caucasian race, as distinguished from the Mongolian. With this agree modern travelers, such as Bryce and W. H. Ward. Some modern ethnologists, indeed, reject altogether the "Caucasian or white" classification; but their theories do not help the United States. Ripley, for example, asserts that there is no "European or white race," and that there are three great races to be found in Europe, one of which may have come from Africa across the Mediterranean. Topinard, as quoted by Ripley, has said:

"Race in the present state of things is an abstract conception, a notion of continuity in discontinuity, of unity in diversity. It is the rehabilitation of a real but directly unattainable thing."

Race, thus defined, is not an easy working test of "white" color as required by section 2169.

In so far as the test is affected by "ideals, standards, and aspirations," the result is the same. In the warfare which has raged since

the beginning of history about the eastern Mediterranean between Europeans and Asiatics, the Armenians have generally, though not always, been found on the European side. They resisted both Persians and Romans, the latter somewhat less strenuously. By reason of their Christianity, they generally ranged themselves against the Persian fire worshipers, and against the Mohammedans, both Saracens and Turks. Conquered by the Saracens in the seventh century, they recovered their independence in the ninth century under princes, who, they said, were of the lineage of David. Finally conquered in Armenia by the Turks, their refugees set up an independent state in Cilicia,

"Streaming the ensign of the Christian cross
Against black pagans, Turks and Saracens."

Their latest ruler, of the French house of Lusignan, maintained himself beyond 1350. Here is Adana, where Mouradian was born. Halladjian was born in Syria, not far away. No one of the petitioners was born in Armenia. Since their final overthrow, the Armenians have been oppressed by the Turks, and have looked vainly to Europe for relief. They are dispersed through Asia Minor. From 200,000 to 400,000 of them are settled in various parts of Europe, principally in and about Constantinople and in Bessarabia.

Present war and their remoteness are said to have prevented the Armenian bishops from attending the Council of Chalcedon in the fifth century. Thus they say that they were misled as to the pronouncements of that Council, and so a schism arose without heresy on their part. However this may be, the ecclesiastical separation has continued to the present day, and the chief patriarch of the independent Armenian church inhabits, under Russian protection, a convent of great antiquity at the foot of Mt. Ararat. During the Crusades and afterwards many Armenians came into the obedience of the Roman Catholic Church, while retaining distinctive rites and customs. An Armenian convent in the Roman obedience has long been famous in the Venetian lagoons. These facts are stated, without reproach to the followers of Mohammed or of Zoroaster, because history has shown that Christianity in the near East has generally manifested a sympathy with Europe rather than with Asia as a whole.

If the court should inquire, as the United States suggests concerning Hebrews, May Armenians "become westernized and readily adaptable to European standards?" the answer is, Yes. They have dealt in business with Greeks, Slavs, and Hebrews, as well as with Turks, they have sought a modern education at Robert College and other American schools in the East, and they have pursued by immigration the civilization of Great Britain and of the United States.

For all these reasons the Armenians are not to be excluded from naturalization by reason of their race. So far as the test by race is applicable, they are to be classed as Caucasian or white, while the Finns by ethnological theory, and the Magyars by their known history, are deemed to belong to the Mongolian or yellow race.

Section 2169, however, makes no mention of race or of racial discrimination. "White persons" are to be naturalized and (except Africans) no others. If we pass from racial speculation and remote history

to the usage of the colonies and of the United States in statutes and in official documents, the interpretation of the word "white" will be found less difficult. In this interpretation the statutes for taking the census and the actual classification employed therein are instructive. A census, dealing with all inhabitants (except untaxed Indians in some cases), cannot discriminate against any inhabitant by omission. The Massachusetts census of 1764 classified the inhabitants of the province as whites, negroes and mulattos, Indians, and "French neutrals." The Rhode Island census of 1748 as whites, negroes, and Indians.; that of 1774 as whites, blacks, and Indians. The Connecticut census of 1756 classified the persons enumerated as whites, negroes, and Indians; that of 1774 as whites and blacks. The blacks were classified as negroes and Indians. The New York census of 1698 classified the persons enumerated as men, women, children, and negroes; that of 1723 as whites, negroes, and other slaves; those of 1731, 1737, 1746, 1749, 1756, and 1771 as white and black; that of 1786 as whites, slaves, and "Indians who pay taxes." The New Jersey census of 1726 classified the persons enumerated as whites and negroes; that of 1737–38 as whites, negroes, and other slaves. The Maryland census of 1755 classified the persons enumerated as whites and blacks. A Century of Population Growth in the United States, published by the Department of Commerce and Labor in 1909, chapter on White and Negro Population, and Enumerations of Population in North America prior to 1790. "The population of the earliest English settlements in America," so the chapter opens, "was composed of two elements, white and negro. These two elements, though subject to entirely different conditions, continue to compose the population of the republic." Page 80. Here, again, "white" is made to include all persons not otherwise specified.

The census act of 1790 (Act March 1, 1790 c. 2, 1 Stat. 101) provided for a census of all the inhabitants of the United States, except Indians not taxed. These inhabitants were to be classified by "color," and the schedule provided by the statute made a classification as free whites, other free persons, and slaves. It is evident from the government publication just quoted that the phrase "other free persons" was construed to mean "free negroes," and this was substantially the classification made in the censuses taken in the first half of the nineteenth century. Act May 23, 1850, c. 11, 9 Stat. 428, 433, for the taking of the seventh and subsequent censuses, provided in the statutory schedule for a classification of free inhabitants by color as "white, black, or mulatto." In the census of 1860 the classification was "white, free colored, and slaves," and the class "free colored" was subdivided between blacks and mulattoes. Rev. St. § 2206, provided for census schedules classifying all inhabitants of the United States by color as "white, black, or mulatto," although there appears to have been special provision for the enumeration of Indians (Act March 1, 1889, c. 319, § 9, 25 Stat. 763), and the enumeration was made accordingly. "For the censuses from 1790 to 1850, inclusive, the population was classified as white, free negro, and slave only, while for the censuses from 1860 to 1890, inclusive, the population included, besides the white and negro elements, the few Chinese, Japanese, and civilized Indians reported at each of these censuses." Eleventh Census, part I, p. xciv.

In fact, the classification was not uniform in all parts of the country. Census Act March 3, 1899, c. 419, § 7, 30 Stat. 1014 (U. S. Comp. St. 1901, p. 1339), provided for a classification of inhabitants by "color," and appears to have left the preparation of schedules to the director of the census. The classification employed, in some instances at least, was as whites, negroes, Indians, Chinese, and Japanese. In other instances "colored," as opposed to "white," was used to include negroes, Chinese, Japanese, and Indians. Throughout the chapter cited in the above-mentioned Bulletin, it is assumed that all persons not classified as white, in the first eight federal censuses at any rate, were negroes or Indians.

This use of the word "white," which has been illustrated from the censuses, both colonial and federal, is further exemplified in modern statutes requiring separate accommodation in travel. A statute of Arkansas requires separate accommodation for the "white and African races," and provides that all persons not visibly African "shall be deemed to belong to the white race." Acts 1891, p. 17, c. 17, § 4. See, also, Laws Fla. 1909, p. 39, c. 5893; Acts Va. 1902–1904 (Extra Sess.) p. 987, c. 609, subc. 4 (Code 1904, § 1291d); Civ. Code S. C. 1902, § 2158. Concerning the use of the word "white" in treating of schools, see Civ. Code S. C. 1902, § 1231; Ky. St. 1909 (Russell's) §§ 5607, 5608, 5642, 5765 (Ky. St. 1909, §§ 4523, 4524, 4428, 4487). The recent Constitution of Oklahoma (article 23, § 11) reads as follows:

"Whenever in this Constitution and laws of this state the words 'colored' or 'colored person,' 'negro' or 'negro race' are used, the same shall be construed to mean to apply to all persons of African descent. The term 'white race' shall include all other persons."

References like those made above could be multiplied indefinitely. From all these illustrations, which have been taken almost at random, it appears that the word "white" has been used in colonial practice, in the federal statutes, and in the publications of the government to designate persons not otherwise classified. The census of 1900 makes this clear by its express mention of Africans, Indians, Chinese, and Japanese, leaving whites as a catch-all word to include everybody else. A similar use appears 130 years earlier from the provincial census of Massachusetts taken in 1768, where "French neutrals" are not reckoned as white, persons, notwithstanding their white complexion. Negroes have never been reckoned as whites; Indians but seldom. At one time Chinese and Japanese were deemed to be white, but are not usually so reckoned today. In passing the act of 1790 Congress did not concern itself particularly with Armenians, Turks, Hindoos, or Chinese. Very few of them were in the country, or were coming to it, yet the census taken in that year shows that everybody but a negro or an Indian was classed as a white person. This was the practice of the federal courts. While an exhaustive search of the voluminous records of this court, sitting as a court of naturalization, has been impossible, yet some early instances have been found where not only western Asiatics, but even Chinese, were admitted to naturalization. After the majority of Americans had come to believe that great differences separated the Chinese, and later the Japanese, from other imigrants,

these persons were no longer classified as white; but while the scope of its inclusion has thus been somewhat reduced, "white" is still the catch-all word which includes all persons not otherwise classified.

The interpretation which has been put upon the statutes of naturalization by the courts does not conflict substantially with the principles above stated. In Fong Yue Ting v. United States, 149 U. S. 698, 716, 13 Sup. Ct. 1016, 37 L. Ed. 905, it was said by Mr. Justice Gray, speaking for the Supreme Court in 1893, that:

"Chinese persons not born in this country have never been recognized as citizens of the United States, nor authorized to become such under the naturalization laws."

So far as this statement construed in 1893 the existing statutes of the United States even apart from the statute of 1882, it was authoritative. But it was not correct, if historically applied to the practice of federal courts one or two generations earlier. The change of sentiment and usage had produced a change in the construction of the statute. That a change in the meaning of a word should affect the operation of a statute is at least unusual, and may offend legal principles; but this has been the historical result. Only after the feeling concerning the Chinese had led to a discrimination between them and other aliens was their naturalization refused, and, as has been stated above, it was certainly permitted by the act of 1862, and by the Revised Statutes of 1873. The federal censuses classified them as whites until 1860. To the same effect as Fong Yue Ting are In re Ah Yup, Fed. Cas. No. 104; In re Gee Hop (D. C.) 71 Fed. 274; In re Hong Yen Chang, 84 Cal. 163, 24 Pac. 156. In these cases the distinction made was between Caucasian and Mongolian.

Somewhat later it was decided, both in this court and elsewhere, that Japanese are also excluded from naturalization. In re Saito (C. C.) 62 Fed. 126; In re Buntaro Kumagai (D. C.) 163 Fed. 922; In re Knight (D. C.) 171 Fed. 299; In re Yamashita, 30 Wash. 234, 70 Pac. 482, 94 Am. St. Rep. 860. In the last case the distinction was made between Caucasian and Mongolian. The United States has laid emphasis upon an expression of this court in the Saito Case that Asiatics are excluded from naturalization, but the context shows that the court there used the word "Asiatics" to mean members of the Mongolian or yellow race, and those Asiatics alone. To make the list complete, reference should be had to the case of Indians. In re Camille (C. C.) 6 Fed. 256; In re Burton, 1 Alaska, 111. The City Court of Albany refused to naturalize a Burmese on the ground that he was a Malay or a Mongol (In re Po, 7 Misc. Rep. 471, 28 N. Y. Supp. 383), and the Supreme Court of Utah refused to naturalize a Hawaian because he was not a Caucasian (In re Kanaka Nian, 6 Utah, 259, 21 Pac. 993, 4 L. R. A. 726). A Mexican of aboriginal descent was naturalized, largely because of treaties with Mexico. In re Rodriguez (D. C.) 81 Fed. 337. Judge Lacombe, in the Circuit Court for the Southern District of New York, admitted a Parsee to naturalization, though with considerable doubt. In re Balsara (C. C.) 171 Fed. 294. A Syrian was lately admitted, against the opposition of the United States, in the Circuit Court for the District of Rhode Island, and the

newspapers report that a like decision has been reached in a federal court sitting in Georgia, while the contrary has been decided by a federal court sitting in Nebraska. No authentic reports have been received of the two cases last mentioned.

We find, then, that there is no European or white race, as the United States contends, and no Asiatic or yellow race which includes substantially all the people of Asia; that the mixture of races in western Asia for the last 25 centuries raises doubt if its individual inhabitants can be classified by race; that, if the ordinary classification is nevertheless followed, Armenians have always been reckoned as Caucasians and white persons; that the outlook of their civilization has been toward Europe. We find, further, that the word "white" has generally been used in the federal and in the state statutes, in the publications of the United States, and in its classification of its inhabitants, to include all persons not otherwise classified; that Armenians, as well as Syrians and Turks, have been freely naturalized in this court until now, although the statutes in this respect have stood substantially unchanged since the First Congress; that the word "white," as used in the statutes, publications, and classification above referred to, though its meaning has been narrowed so as to exclude Chinese and Japanese in some instances, yet still includes Armenians. Congress may amend the statutes in this respect. To provide more specifically what persons may be admitted to citizenship seems desirable. While the statutes are unchanged, without proof, if proof be admissible, that the meaning of the word "white" has been still further narrowed, this court will not deny citizenship by reason of their color to aliens who, like the Armenians, have hitherto been granted it.

The petitioners will be admitted to citizenship.