## Commonwealth v. Zankl

*Henry J. Rutherford,* for Commonwealth.
*Edgar R. Barnes,* for defendant.

BROWN, J., January 23, 1970.—In this case, defendant, George Zankl (George), has been convicted of violation of section 654 of The Penal Code of June 24, 1939, P. L. 872, 18 PS §4654. This section makes it a crime to discriminate on account of race, creed, or color. Defendant, Antonia Zankl (Antonia), has been convicted of simple assault and battery on two counts. Both defendants moved for new trials and in . arrest of judgment, and both motions for new trials contain only the usual averments that the verdict was contrary to the evidence, contrary to the weight of

the evidence, and contrary to the law. As to the motions in arrest of judgment, the evidence must be considered in the most favorable light to the Commonwealth. See Commonwealth v. Wright, 383 Pa. 532 (1956), and Commonwealth v. Frazier, 411 Pa. 195 (1963).

Applying the above principle of law, we will briefly review the record in this case to determine first whether judgment should be arrested as to either or both defendants, and whether a new trial is warranted as to either or both.

George is the owner of a Restaurant Liquor License No. R16967 issued to him by the Pennsylvania Liquor Control Board where he operates a hotel at Holtwood, R. D. No. 2, in Martic Township, Lancaster County, Pa., which license he has held since August 17, 1945, and has had no citations for any violations of the law in the 24 years that have elapsed since that time.

On November 23, 1968, one Porfirio Irizarry Ramos, an American born in Puerto Rico, sent his brother, Wencaslao Irizarry, to defendant's place of business to purchase some cigarettes. It appears that George made Wencaslao Irizarry wait a considerable amount of time for change to put in the cigarette machine. After the change was given to Wencaslao Irizarry and he purchased the cigarettes, he returned to the place that he and his brother Porfirio Irizarry Ramos were visiting in the community, and together they decided to return to George's place of business to protest the treatment that Wencaslao Irizarry had received.

The brothers arrived at George's place of business about 9 p.m., and they entered the same and ordered some beer. Shortly after they entered the hotel, George told them that he did not want any dirty Puerto Rican

sons-of-bitches in the place and told them to get out. George also pushed them to hurry their departure. A third and fourth Puerto Rican, friends of the first two, entered and were likewise told to leave. Two of them attempted to get the number on the liquor license which was hanging on the wall behind the bar, and the proprietor's wife, defendant Antonia, sprayed "mace" in the eyes of these two men, Porfirio Ramos and Nelson Irizarry, blinding them for a few moments. The Puerto Ricans then left the property, went to the Pennsylvania State Police Headquarters, and filed the above charges against George and Antonia. The jury convicted them and the present motions in arrest of judgment and for a new trial are now before this court en banc.

While several issues are raised in these motions, the principal and most important one is whether there was any evidence that a crime has been committed by George on the charge of violation of section 654 of The Penal Code, supra. The act involved, after stating a purpose to make all public accommodations applicable to all persons, provides, in pertinent part, as follows:

". . . Whoever, being the owner, lessee, proprietor, manager, superintendent, agent or employe of any such place, directly or indirectly refuses, withholds from, or denies to, any person, any of the accommodations, advantages, facilities or privileges thereof, or directly or indirectly publishes, circulates, issues, displays, posts or mails any written or printed communication, notice or advertisement to the effect that any of the accommodations, advantages, facilities and privileges of any such places, shall be refused, withheld from, or denied to, any person on account of *race, creed, or color,* or that the patronage or custom thereat of any person belonging to, or purporting to be of, any particular race, creed, or color is unwelcome, ob-

jectionable or not acceptable, desired or solicited, is guilty of a misdemeanor . . ." (Emphasis supplied.)

This act, being a penal statute, must be strictly construed and must not be confused with other acts of the Pennsylvania Legislature on the same subject with or without penal provisions. There are several State and Federal statutes which prohibit discrimination on account of race, color, religious creed, ancestry, age or national origin, but it is noteworthy that the act here being interpreted proscribes discrimination only as to race, creed or color. Conceding that George did deny the Puerto Ricans in this case the facilities of his hotel, was it because of race, creed or color? It cannot be denied that if there was such a refusal, it was because the individuals were Puerto Ricans.

In addition to the extensive brief supplied to the court on the question of whether the use of the words "Puerto Ricans," albeit in a profane manner, used by George in his efforts to eject these people, constituted a violation of the statute, the court has made extensive research on this problem. We begin with the definition of "Race" as contained in Black's Law Dictionary, Fourth Edition, at page 1423, as follows:

"An ethnical stock; a great division of mankind having in common certain distinguishing physical peculiarities constituting a comprehensive class appearing to be derived from a distinct primitive source. A tribal or national stock, a division or subdivision of one of the great racial stocks of mankind distinguished by minor peculiarities. Descent. In re Halladjian, C.C. Mass., 174 F. 834; Ex parte (Ng.) Fung Sing, D. C. Wash., 6 F. 2d 670."

We further this with a definition of "Puerto Rican" as contained in Webster's New International Dictionary, Second Edition, Unabridged, Volume IV, at page 2007, as follows:

"Of or pertaining to Puerto Rico. —n. A native or citizen of Puerto Rico, the native inhabitants being persons of Spanish descent, Negroes, and persons of mixed blood."

Since these definitions indicate race is a great division of mankind and that Puerto Ricans are persons of Spanish descent, Negroes, and of mixed-blood, it would first appear to the court that a reference to "Puerto Ricans" as used by George would constitute a violation of the criminal statute here involved. However, while the court is not anxious to get into a lengthy discussion on the issue of semantics, it has further investigated "Races of Man" to determine whether Puerto Ricans are of a particular race which would make a refusal to serve them a violation of the penal statute which, as heretofore stated, must be strictly construed. "Races of Man" are defined in The World Book Encyclopedia, 1964 Edition, Volume 16, at page 51, as classified by anthropologists under three major stocks—Caucasoid, or white; Mongoloid, or yellow; and Negroid, or black. This same reference defines Caucasoid as, among other things, "European—Nordic (northwestern Europe) and East Baltic (northeastern Europe); Alpine (central Europe), Dinaric (southeastern Europe), Armenoid and Iranian-Plateau (Asia Minor); Mediterranean (southern Europe), Arabic (Asia Minor), Indo-Dravidic (India)."

Again referring to The World Book Encyclopedia, 1964 Edition, Volume 15, at page 774, we find the following relating to "Puerto Ricans":

". . . By far the largest part of the present population is of Spanish descent. There are smaller numbers of Portuguese, Italians, and French. Some people from the United States mainland also have settled on the island."

From this it would appear to the court that Puerto Ricans are predominantly of Spanish descent, Caucasian, and, therefore, of the white race. Clearly, they are not Mongoloid or Negroid. When, therefore, George referred to the people he ejected as "Puerto Ricans" he was not, in this court's opinion, referring to them as a race. Their creed as a general body is Christian, Roman Catholic, and their color is predominantly white.

Applying the above logic to this case, it seems to the court that had George stated that he doesn't like Irishmen, Italians or Spaniards, he would not have violated the terms of this statute. He was denying service to the customers because they were Puerto Ricans and not because of their race, creed, or color. Under the circumstances, the court feels that it erred in charging the jury ". . . subject only to the conditions and limitations established by law and applicable alike to all persons. Now, that limitation would mean not only to a Puerto Rican or any minority group, but to any person who would come in there. . .". In so charging the jury, the court failed to limit the scope of the discriminating act to only race, creed or color, and while this interpretation would be proper under the Federal and other Pennsylvania State acts where discrimination is proscribed against religious sect, creed, class, denomination or nationality, it was not applicable here. In this court's judgment, race, creed or color does not apply to Puerto Ricans because even the record is barren of any proof that Puerto Ricans are of a separate race, creed or color from what might be any group of American citizens, such as southerners, or Texans, or any other group that are sectionally defined. The court therefore feels that irrespective of whether its charge was too broad by not limiting the

issue to race, creed or color, as alone specified in the act under which George was prosecuted, the evidence here was not sufficient to warrant a conviction simply for refusing the prospective customers because they were Puerto Ricans, even though done in a profane manner. For the foregoing reasons, the court will sustain the motion in arrest of judgment of defendant George Zankl.

It goes without saying that creed or color were not involved in this case because clearly no reference was made to the creed or to the color of the parties George refused to serve at the time of this alleged offense.

In view of the foregoing, the court need not and will not pass on the issues raised by George in his motion for a new trial, since under the above ruling it must arrest the judgment.

As to the conviction of Antonia Zankl on two charges of assault and battery, the court feels that this conviction was warranted. Counsel for Antonia strongly urges in his brief and argument that Antonia's conviction of assault and battery is not justified because she was defending her home even though the offense was committed in a barroom, contending that even in a public inn an innkeeper may eject an undesirable customer. More strenuously, however, the argument is presented that if a married woman commits a crime in her husband's presence, which occurred here, the law would presume that coercion existed, coercion being presumed from the fact that her spouse was present during the commission of the unlawful act. The court rejects this theory and feels that the rule protecting a married woman has been substantially relaxed in Pennsylvania, and that the ancient theory of a wife's coercion by her husband does not apply in this case. The recent

history of this legislation relating to married women has shown a strong tendency to enlarge the scope of freedom on the part of married women, and in the court's judgment, except under very unusual circumstances not here present, the theory of coercion by a husband in the commission of a crime by a wife is no longer valid. The United States District Court for the Middle District of Pennsylvania has spoken to this problem in the case of United States of America v. Anthony, 145 F. Supp. 323 (1956), at page 340, when it said:

"Is the rule otherwise where a married woman and her husband are involved? See IX Wigmore on Evidence, 3d Ed., §2514, p. 425, '. . the coercion of the husband, which in Blackstone's correct phrase may be "an excuse for criminal misconduct" of the wife, may at common law be presumed from the husband's presence; this then creates for the prosecution a duty of adducing evidence of the wife's willing participation, the risk of nonpersuasion remaining throughout upon the prosecution. But this presumption since the rise of feminism is on its way to disappearance.'

"See Id., IX Wigmore, p. 425, footnote 7, 'The presumption is being abandoned by the federal courts; Dawson v. United States, 9 (Circ.), 1926, 10 F.2d 106. . . Conyer v. United States, 6 (Cir.), 1936, 80 F. 2d 292 (. . . presumption repudiated),' To which we add United States v. DeQuilfeldt, C.C.W.D. Tenn. 1881, 5 F. 276, at page 278, the '. . . defence . . is not a favored one, and, at least in modern times, has almost lost all solid foundation for its existence. . . .' United States v. Hinson, D.C.S.D. Fla. 1925, 3 F. 2d 200; Haning v. United States, 8 Cir., 1932, 59 F. 2d 942, at page 943; United States v. Swierzbenski, D.C.W.D. N.Y. 1927, 18 F. 2d 685. See discussion and authorities

cited in State v. Renslow, 1930, 211 Iowa 642, 230 N.W. 316, 71 A.L.R. 1111; Morton v. State of Tenn., 1919, 141 Tenn. 357, 209 S.W. 644, 4 A.L.R. 264.

"Even if one were to indulge the presumption, it is a weak one and may be rebutted by slight circumstances. 20 Am. Jur. Evidence, §215, p. 214; 27 Am. Jur. Husband and Wife, §642, '. . . proof that her conduct was inconsistent with any coercion on his part suffices for the purpose,' and see 41 C.J.S., Husband and Wife, §222, p. 717, 718. 'Presumptions are only intended to supply the place of facts and not to contradict them, and cannot be relied upon where the facts actually appear.' 2 Henry Pa. Evidence, supra, §651, p. 77, and see Watkins v. Prudential Ins. Co., 1934, 315 Pa. 497, at page 503, 173 A. 644, 95 A.L.R. 869. Here there was an abundance of evidence to negative any presumption if any in fact existed. Cf. Burgner v. United States, 4 Cir., 1921, 272 F. 116; United States v. Terry, D.C.N.D. Cal. 1890, 42 F. 317, at page 319; Kelly v. United States, 10 Cir., 1935, 76 F. 2d 847; Johnson v. United States, supra, 157 F. 2d 209; Thompson v. United States, supra, 227 F. 2d 671; Com. v. Hand, 1915, 59 Pa. Super. 286."

See also, Commonwealth v. Robert P. Goper, 60 Schuy. L. Rec. 183 (1964).

The court adopts the language of the district court in Anthony, supra, and feels, as it will be hereinafter demonstrated in this opinion, that Antonia was in nowise coerced by her husband but acted only against the two Puerto Ricans when they started to come behind the bar to take the license number. This could readily have been a defense to the charge of assault and battery, but it was a factual issue for defendant Antonia to establish beyond a reasonable doubt that her actions did not constitute the offense of assault and battery when she squirted "mace" into the eyes of the

two prosecuting witnesses. This act, in itself, is a somewhat violent act and temporarily very painful.

With respect to the discussion in the previous paragraph, the court charged the jury as follows: "In determining whether Mrs. Zankl is guilty of simple assault and battery and using this mace, you will again have to determine whether what was done by these prosecuting witnesses, as the court reviews the testimony to you, as to them going behind the bar, as she said, to get the license number, whether she was apprehensive of misconduct on their part which required her to defend herself by virtue of which she used this mace, which she said. . . . Now, that would be the assault and battery, if you find, under the circumstances that I have just defined to you, that that was done and whether there was any provocation in any way, shape or form, for Mrs. Zankl to use this mace, because there is no dispute in the testimony that she did use mace as these witnesses, as I recall it, started to come behind the bar to take the license number, the liquor license number."

From the above quotation, it clearly appears that the court told the jury that Antonia should not be convicted if she was apprehensive of misconduct on the part of the "victims" which required her to defend herself, by virtue of which she used this "mace." The court feels that the question of the guilt or innocence of Antonia was a clear question of fact and was properly submitted to the jury. Accordingly, Antonia Zankl's motions for a new trial and in arrest of judgment must be refused.

## ORDER

And now, January 23, 1970, the motion in arrest of judgment of defendant, George Zankl, on the charge of

discrimination on account of race, creed or color, is sustained, and defendant, George Zankl, is discharged, and the costs of this prosecution are placed on the County of Lancaster. The motions for a new trial and in arrest of judgment of defendant, Antonia Zankl, on two counts of assault and battery are refused and denied.