## TAKAO OZAWA *v.* UNITED STATES.

### CERTIFICATE FROM THE CIRCUIT COURT OF APPEALS FOR THE NINTH CIRCUIT.

No. 1. Argued October 3, 4, 1922.—Decided November 13, 1922.

1. Section 2169 of the Revised Statutes, which is part of Title XXX dealing with naturalization, and which declares: " The provisions of this Title shall apply to aliens, being free white persons, and to aliens of African nativity and to persons of African descent," is consistent with the Naturalization Act of June 29, 1906, and was not impliedly repealed by it. P. 192.

2. Revised Statutes, § 2169, *supra,* stands as a limitation upon the Naturalization Act, and not merely upon those other provisions of Title XXX which remain unrepealed. P. 192.

3. The intent of legislation is to be ascertained primarily by giving words their natural significance; but if this leads to an unreasonable result plainly at variance with the policy of the legislation as a whole, the court must look to the reason of the enactment, inquiring into its antecedents, and give it effect in accordance with its design and purpose, sacrificing, if necessary, the literal meaning, in order that the purpose may not fail. P. 194.

4. The term " white person," as used in Rev. Stats., § 2169, and in all the earlier naturalization laws, beginning in 1790, applies to such persons as were known in this country as " white," in the racial sense, when it was first adopted, and is confined to persons of the Caucasian Race. P. 195.

5. The effect of the conclusion that " white person " means a Caucasian is merely to establish a zone on one side of which are those clearly eligible, and on the other those clearly ineligible, to citizenship; individual cases within this zone must be determined as they arise. P. 198.

6. A Japanese, born in Japan, being clearly not a Caucasian, cannot be made a citizen of the United States under Rev. Stats., § 2169, and the Naturalization Act. P. 198.

QUESTIONS certified by the court below, arising upon an appeal to it from a judgment of the District Court of Hawaii which dismissed a petition for naturalization. The case was argued with *Yamashita* v. *Hinkle, post,* 199, and was decided at the same time.

*Mr. George W. Wickersham,* with whom *Mr. David L. Withington* was on the briefs, for Takao Ozawa.

The Act of June 29, 1906, establishes a uniform rule of naturalization, and that rule is not controlled or modified by § 2169, Rev. Stats.

The constitutional grant of power, the title of the act, its scope and terms, show that, save in definitely excepted cases, it is a complete, exclusive and uniform rule of naturalization.

Congress exercised this power in the first Congress, second session, and passed the Act of March 26, 1790, 1 Stat. 103, entitled, "An Act to establish an uniform rule of naturalization." This act was repealed by a like act with a like title in 1795, and that by the Act of April 14, 1802, 2 Stat. 153, which in turn was entitled, "An Act to establish an uniform rule of naturalization." This in turn became Title XXX of the Revised Statutes, which comprised the uniform rule of naturalization until the passage of the Act of June 29, 1906, which purports to be and is entitled, "An Act To establish a Bureau of Immigration and Naturalization, and to provide for a uniform rule for the naturalization of aliens throughout the United States."

This act purports to be a complete act. It provides, in § 3, for exclusive jurisdiction of naturalizing aliens, and in § 4, "that any alien may be admitted to become a citizen of the United States in the following manner, and not otherwise;" followed by five paragraphs prescribing the conditions of admission, among them, in paragraph two, that the petition shall set forth " every fact material to his naturalization and required to be proved upon the final hearing of his application." In § 27 the form of this petition is given, containing the allegations which Congress believed were " material to his naturalization and required to be proved;" but nothing with reference to color or race.

The intent of Congress to enact, and its belief that it had enacted, a uniform rule for naturalization, covering the entire subject and even giving to the rules and regulations the force of law, are clear. *In re Brefo,* 217 Fed. 131; *United States* v. *Rodiek,* 162 Fed. 469; *Bessho* v. *United States,* 178 Fed. 245; *In re Leichtag,* 211 Fed. 681; *In re Mallari,* 239 Fed. 416; *Hampden County* v. *Morris,* 207 Mass. 167; *United States* v. *Ginsberg,* 243 U. S. 472; *United States* v. *Ness,* 245 U. S. 319; *United States* v. *Peterson,* 182 Fed. 289, 291.

The unrepealed sections of Title XXX and a few other special acts provide for naturalization in cases excepted from the uniform law. *In re Kumagai,* 163 Fed. 922; *In re Loftus,* 165 Fed. 1002; *United States* v. *Meyer,* 170 Fed. 983; *In re McNabb,* 175 Fed. 511; *In re Leichtag, supra; United States* v. *Lengyel,* 220 Fed. 720; *In re Sterbuck,* 224 Fed. 1013; *In re Tancrel,* 227 Fed. 329.

Section 2169 is not restrictive in terms, and if restrictive only applies to Title XXX, Rev. Stats., and the cases excepted from the general rule. Section 2169, as originally enacted, is an enlarging provision, derived from the Act of 1870, c. 254, 16 Stat. 256, which extended the naturalization laws to aliens of African nativity and to persons of African descent. It is not a restrictive declaration; and the introduction into it of the words " being free white persons and to aliens," by the Act of 1875, c. 80, 18 Stat. 318, does not change the provision from an enlarging to a restrictive one. There is nothing in the language used to show the intention of Congress to restrict naturalization to free white persons and Africans by this amendment of 1875.

If construed otherwise, naturalization from the passage of the Revised Statutes to the amendatory Act of 1875, would have been restricted to those of African nativity or descent.

The Chinese Exclusion Act of May 6, 1882, c. 126, § 14, 22 Stat. 58, 61,—passed after it had been held that the

language of § 2169 excluded the Chinese, *In re Ah Yup,* 5 Sawy. 155; and a half Indian, *In re Camille,* 6 Fed. 256,— supports this view. In any event, § 2169 is applicable only to Title XXX and does not apply to the Act of June 29, 1906.

The origin of the Act of 1906 shows that it was intended to be a complete scheme for naturalization, the test being " fitness for citizenship," with no discrimination against Japanese. Message of President Roosevelt, December 5, 1905, 40 Cong. Rec., pt. 1, p. 99. This policy, announced by President Roosevelt, has been steadily followed in legislation in respect both to naturalization and immigration, including the Immigration Act of 1917.

These acts show the traditional policy of the United States to welcome aliens, modified only by restrictions against contract laborers, those morally, mentally and physically unfit for citizenship and the Chinese, but with no restrictions against the Japanese race.

Numerous Chinese Exclusion Acts have been passed; but there is no line in any statute before or since 1875 which indicates any intention to classify the Japanese with those excluded or to discriminate against them in any way.

This Court in a recent case, in reviewing the history of the Immigration Acts, has held that the purpose of applying these prohibitions against the admission of aliens is to exclude classes (with the possible exception of contract laborers) who are undesirable as members of the community, even if previously domiciled in the United States. *Lapina* v. *Williams,* 232 U. S. 78; *In re Gee Hop,* 71 Fed. 274–275.

The Immigration Act of 1917, and the circumstances of its passage in Congress, show the clear intention of that body to make no declaration that Japanese are excluded from naturalization. Any other construction would be violative of the existing treaty with Japan.

The Act of May 9, 1918, amending the Act of June 29, 1906, tends to support the view that § 2169 is only restrictive of Title XXX of which it is a part. No court, excepting Judge Lowell, *In re Halladjian,* 174 Fed. 834, has taken into consideration what that section plainly says.

Section 2169, if applicable to the Act of 1906, must be construed like the Act of March 26, 1790, and, so construed, "free white persons" means one not black, not a negro; which does not exclude Japanese.

At the time the original law was passed, which provided for the admission of "aliens being free white persons," there can be no question but white was used in counterdistinction from black, and "free white persons" included all who were not black. The latter were chiefly slaves, regarded as an inferior race.

"White person," as construed by this Court and by the state courts, means a person without negro blood. *United States* v. *Perryman,* 100 U. S. 235; *Dred Scott* v. *Sandford,* 19 How. 393, 420; *Du Val* v. *Johnson,* 39 Ark. 182, 192.

The primary definition of these words, as given by the great dictionaries, is one who is white, not black, nor a negro.

The insertion by Congress of the word "free" in § 2169, in 1875, a word which had a definite meaning in 1790, but has no meaning if construed as a new enactment in 1875, shows the intention to reënact the old section with the old meaning.

Giving the words "free white persons" their common and popular acceptation in 1875, no "uniform rule" can be laid down, based on color, race or locality of origin, and there is nothing in the laws of the United States, its treaties, in the history of the time, or the proceedings of Congress, to show that Japanese were intended to be excluded. Up to 1875, there had been no Japanese immigration, no suggestion of their exclusion. America had

recently opened Japan to the western civilization, which Japan was gladly welcoming.

Judicial construction of the phrase, up to 1875, does not sustain such an exclusion. See *Dred Scott* and *Du Val Cases, supra; Lynch* v. *Clarke,* 1 Sandf. 583; *People* v. *Hall,* 4 Cal. 399; *People* v. *Elyea,* 14 Cal. 145. Cf. 2 Kent's Comm., p. 72.

No "uniform rule," applicable in all cases, can be drawn from the decisions since 1875. *Low Wah Suey* v. *Backus,* 225 U. S. 460; *In re Ah Yup,* 5 Sawy. 155; *In re Hong Yen Chang,* 84 Cal. 163; *In re Po,* 28 N. Y. S. 383; *In re Alverto,* 198 Fed. 688; *In re Mozumdar,* 207 Fed. 115; *In re Dow,* 213 Fed. 355; *Ex parte Shahid,* 205 Fed. 812; *In re Dow,* 226 Fed. 145; *United States* v. *Balsara,* 180 Fed. 694; *In re Camille,* 6 Fed. 256; *In re Mudarri,* 176 Fed. 465; *In re Saito,* 62 Fed. 126; *In re Kumagai,* 163 Fed. 922; *Bessho* v. *United States,* 178 Fed. 245; *In re Knight,* 171 Fed. 299; *In re Yamashita,* 30 Wash. 234; *In re Nian,* 6 Utah, 259; *In re Rodriquez,* 81 Fed. 337.

The policy of the United States has been to include into its citizenship by annexation vast numbers of members of races not Caucasian, including many Mongolians. The annexation of Hawaii converted thousands of Japanese, not to mention other nationalities, into American citizens. The most recent is the Porto Rico Act, which makes the Porto Ricans, who are as dark as the Japanese, American citizens.

The petitioner in the court below presented an incomplete list of fourteen naturalizations in various courts, and that court says it is understood that about fifty Japanese have been naturalized in state and federal courts. In fact, the census of 1910 shows 209 American born citizens, 420 naturalized, and 389 with first papers, who are Japanese.

The words "free white persons," neither in their common and popular meaning, nor in their scientific defini-

tion, define a race or races, or prescribe a nativity or locus of origin. They deal with personalities and the qualities of personalities, and are only susceptible of meaning those persons fit for citizenship and of the kind admitted to citizenship by the policy of the United States. The words deal with individuals, not with races, nor with natives of any country or of any particular descent.

The word "free" is an essential part of the clause. Under the Constitution, it is used in opposition to slave. It imports a freeman, a superior, as against an inferior class.

"White" we have already sufficiently defined, and shown that the words "free white persons" had in 1875 acquired a signification in American statute law as expressing a superior class as against a lower class, or, to speak explicitly, a class called "white" as against a class called "black"; the white man against the negro.

"Person" is "a living human being; a man, woman or child; an individual of the human race." *United States* v. *Crook*, 25 Fed. Cas. 695. The provisions of the Fourteenth Amendment in reference to persons "are universal in the application to all persons within the territorial jurisdiction without regard to any difference of race, or color, or nationality." *Yick Wo* v. *Hopkins*, 118 U. S. 369. The same rule has been applied to include aliens under the Fifth and Sixth Amendments. *Wong Wing* v. *United States*, 163 U. S. 235.

No case has considered this point or given emphasis in the construction of the section to the words "free" and "persons," which are as important to the construction as the word "white." Nearly all think the section deals with races.

The question certified does not deal with individuals, but with a people, and the affirmative answer would exclude a Japanese who is "white" in color and is of the Caucasian type and race.

The Japanese are " free."   They, or at least the domi-
nant strains, are " white persons," speaking an Aryan
tongue and having Caucasian root stocks; a superior class,
fit for citizenship.

The Japanese are assimilable.

Congress in repeating without qualification the words
" white persons " has left the subject in great uncertainty.
All authorities without exception agree on dismissing the
idea of white as a characteristic to be demonstrated by
ocular inspection.   If it is sought to interpret it as an
ethnological term, authorities are so conflicting that it
opens the way to serious inequalities of application.   To
apply the ambulatory definition which some of the
learned judges have adopted, is to rob the law of all
definiteness and to leave it to the whim of the particular
judge or court.   The only safe rule to adopt is to take
the term as it undoubtedly was used when the naturaliza-
tion law was first adopted, and construe it as embracing
all persons not black, until the Act of 1870, and after
that date, as having no practical significance.   If this
would run counter to the intention of Congress, that body
can readily amend the act so as to make clear the legisla-
tive intention.   But the subject certainly should not be
left in the uncertain state in which it now is.

So far as the petitioners in the Yamashita case [*post,*
199,] are concerned, all that appears is that they were
born in Japan and that they were duly naturalized by a
state court in 1902.   Every intendment of fact in favor
of the jurisdiction therefore must be presumed. . They
may have been pure blooded Ainos, and as such " Cau-
casian " within the meaning of that term, as employed
by most of the ethnologists and in a majority of the
decisions construing the term " white persons " to mean
those of the Caucasian race, so that in any event the
judgment of the lower court must be reversed.

*Mr. Solicitor General Beck,* with whom *Mr. Alfred A. Wheat,* Special Assistant to the Attorney General, was on the brief, for the United States.

The Act of June 29, 1906, is not complete in itself but is limited in its application to the eligible classes of persons mentioned in § 2169, Rev. Stats. At the time of the passage of the Act of 1906, through a uniform course of judicial construction of statutory language, continued in the law for over a century, it had become settled that Japanese and all other people not of the white or Caucasian race were not eligible for naturalization as "white persons." *In re Ah Yup,* 5 Sawy. 155; *In re Hong Yen Chang,* 84 Cal. 163; *In re Gee Hop,* 71 Fed. 274; *In re Po,* 28 N. Y. S. 383; *In re Nian,* 6 Utah, 259; *In re Camille,* 6 Fed. 256; *In re Burton,* 1 Alaska, 111; *In re Saito,* 62 Fed. 126.

The Act of 1906 did not extend the privilege of naturalization to any persons not theretofore eligible. Section 2169, Rev. Stats., was not repealed, and was specifically reaffirmed by the Act of May 9, 1918, c. 69, 40 Stat. 542, making special provision for the naturalization of Filipinos, Porto Ricans, and aliens who served in the military and naval forces of the United States. *Petition of Charr,* 273 Fed. 207, 210–212.

Since the passage of the Act of 1906, the courts without exception have continued to hold that § 2169 was still in force, its limitation still binding. *In re Alverto,* 198 Fed. 688; *In re Kumagai,* 163 Fed. 922; *In re Knight,* 171 Fed. 299; *In re Young,* 198 Fed. 715; *Bessho* v. *United States,* 178 Fed. 245; *United States* v. *Balsara,* 180 Fed. 694; *In re Yamashita,* 30 Wash. 234; *In re Dow,* 226 Fed. 145; *Petition of Charr,* 273 Fed. 207; *In re Halladjian,* 174 Fed. 834; *In re Bautista,* 245 Fed. 765; *In re Singh,* 257 Fed. 209; 246 Fed. 496; *In re Lampitoe,* 232 Fed. 382; *In re Mozumdar,* 207 Fed. 115.

So the ultimate question is, is the Japanese a white person; and it presents itself as a question of statutory

construction.  In the first place it is said that we must give to these words the meaning which they had in the minds of the legislators of 1790, which is probably true; and that they were then used as a sort of " catchall " and meant all men except Negroes and Indians, which is surely untrue.  It is undoubtedly true that the men of 1790 used the words as they understood them, and that their purview of possible and probable immigration comprised only Negroes and white men.  But there is no warrant for believing that in their minds the whole human race consisted of black men, red men, and white men.  To do so is to deny them the intelligence which they surely possessed.  But on the other hand, to argue that they cast their eyes over the earth and considered the races thereof, and then, with deliberation, chose to exclude Chinese, Japanese, and the other yellow and brown peoples, is to give them credit for an imagination which they did not have.  To ascertain their intent, it is not necessary to entangle one's common sense in a web of theory.  The men who settled this country were white men from Europe and the men who fought the Revolutionary War, framed the Constitution and established the Government, were white men from Europe and their descendants.  They were eager for more of their kind to come, and it was to men of their own kind that they held out the opportunity for citizenship in the new nation. It is quite probable that no member of the first Congress had ever seen a Chinese, Japanese or Malay, or knew much about them beyond the fact that they were people living in remote and almost inaccessible parts of the world having manners, customs and language which seemed strange, and unwilling to mingle with western people.  Chinese immigration to this country did not begin until after the discovery of gold in California, and the census of 1870 was the first to report Japanese, 55 in number.

It is a matter of common knowledge that for many years Japan, and to a somewhat less degree, China, maintained a policy of isolation, and this policy continued from the middle of the seventeenth century until the Perry Expedition in 1853. American thought and statesmanship were directed toward Europe, not toward Asia. It was Europe and its "set of primary interests" with which Washington was concerned in his farewell address, and it was against interweaving our destiny with that of any part of Europe, or entangling our peace and prosperity in the toils of European ambitions that he warned his countrymen. It was European trade that was sought and, beyond doubt, European immigration which was desired and expected. Citizenship has always been deemed a choice possession, and it is not to be presumed that our fathers regarded it lightly, to be conferred promiscuously according to a "catchall" classification. It could only be obtained by those to whom it was given, and the men of 1790 gave it only to those whom they knew and regarded as worthy to share it with them, men of their own type, white men. This does not imply the drawing of any narrow or bigoted racial lines, but a broad classification inclusive of all commonly called white and exclusive of all not commonly so called. This has been the rule followed by the courts, and the cases already cited, many of which show exhaustive research and wealth of learning, leave very little to be said. A reading of the opinions of the judges who have written in these cases reveals impressive unanimity in one respect. Each person admitted, with the single exception of the Filipino (*In re Bautista, supra,* a special case), was admitted because he was deemed as matter of fact to be white; each person refused was refused because he was deemed as matter of fact not to be white. The ethnological discussions have covered a wide range of most interesting subjects, particularly in the border-line cases, the Syrian case (*In re*

*Dow,* 226 Fed. 145), and the Armenian case (*In re Halladjian,* 174 Fed. 834). But the present case can not be regarded as a doubtful case. The Japanese is not, and never has been, regarded as white or of the race of white people.

While the views of ethnologists have changed in details from time to time, it is safe to say that the classification of the Japanese as members of the yellow race is prac-tically the unanimous view. Unless it could be demonstrated that the Japanese were of the white race, ethnological differences would be unimportant, even if otherwise relevant.

*Mr. U. S. Webb,* Attorney General of the State of California, and *Mr. Frank English,* by leave of court, filed a brief as *amici curiae.*

MR. JUSTICE SUTHERLAND delivered the opinion of the Court.

The appellant is a person of the Japanese race born in Japan. He applied, on October 16, 1914, to the United States District Court for the Territory of Hawaii to be admitted as a citizen of the United States. His petition was opposed by the United States District Attorney for the District of Hawaii. Including the period of his residence in Hawaii, appellant had continuously resided in the United States for twenty years. He was a graduate of the Berkeley, California, High School, had been nearly three years a student in the University of California, had educated his children in American schools; his family had attended American churches and he had maintained the use of the English language in his home. That he was well qualified by character and education for citizenship is conceded.

The District Court of Hawaii, however, held that, having been born in Japan and being of the Japanese race,

he was not eligible to naturalization under § 2169 of the Revised Statutes, and denied the petition. Thereupon the appellant brought the cause to the Circuit Court of Appeals for the Ninth Circuit and that court has certified the following questions, upon which it desires to be instructed:

" 1. Is the Act of June 29, 1906 (34 Stats. at Large, Part I, Page 596), providing ' for a uniform rule for the naturalization of aliens ' complete in itself, or is it limited by Section 2169 of the Revised Statutes of the United States?

" 2. Is one who is of the Japanese race and born in Japan eligible to citizenship under the Naturalization laws?

" 3. If said Act of June 29, 1906, is limited by said Section 2169 and naturalization is limited to aliens being free white persons and to aliens of African nativity and to persons of African descent, is one of the Japanese race, born in Japan, under any circumstances eligible to naturalization? "

These questions for purposes of discussion may be briefly restated:

1. Is the Naturalization Act of June 29, 1906, limited by the provisions of § 2169 of the Revised Statutes of the United States?

2. If so limited, is the appellant eligible to naturalization under that section?

First. Section 2169 is found in Title XXX of the Revised Statutes, under the heading " Naturalization," and reads as follows:

" The provisions of this Title shall apply to aliens, being free white persons, and to aliens of African nativity and to persons of African descent."

The Act of June 29, 1906, entitled "An Act To establish a Bureau of Immigration and Naturalization, and to provide for a uniform rule for the naturalization of aliens

throughout the United States ", consists of thirty-one sections and deals primarily with the subject of procedure. There is nothing in the circumstances leading up to or accompanying the passage of the act which suggests that any modification of § 2169, or of its application, was contemplated.

The report of the House Committee on Immigration and Naturalization, recommending its passage, contains this statement:

"It is the opinion of your committee that the frauds and crimes which have been committed in regard to naturalization have resulted more from the lack of any uniform system of procedure in such matters than from any radical defect in the fundamental principles of existing law governing in such cases. The two changes which the committee has recommended in the principles controlling in naturalization matters, and which are embodied in the bill submitted herewith are as follows: First. The requirement that before an alien can be naturalized he must be able to write either in his own language or in the English language, and read, speak, and understand the English language; and, Second. That the alien must intend to reside permanently in the United States before he shall be entitled to naturalization." House Report No. 1789, 59th Cong., 1st sess., p. 3.

This seems to make it quite clear that no change of the fundamental character here involved was in mind.

Section 26 of the act expressly repeals §§ 2165, 2167, 2168, 2173 of Title XXX, the subject-matter thereof being covered by new provisions. The sections of Title XXX remaining without repeal are: Section 2166, relating to honorably discharged soldiers; § 2169, now under consideration; § 2170, requiring five years' residence prior to admission; § 2171, forbidding the admission of alien enemies; § 2172, relating to the status of children of naturalized persons, and § 2174, making special provision in respect of the naturalization of seamen.

There is nothing in § 2169 which is repugnant to anything in the Act of 1906. Both may stand and be given effect. It is clear, therefore, that there is no repeal by implication.

But it is insisted by appellant that § 2169, by its terms is made applicable only to the provisions of Title XXX and that it will not admit of being construed as a restriction upon the Act of 1906. Since § 2169, it is in effect argued, declares that " the provisions of *this Title* shall apply to aliens, being free white persons . . . ," it should be confined to the classes provided for in the unrepealed sections of that title, leaving the Act of 1906 to govern in respect of all other aliens, without any restriction except such as may be imposed by that act itself.

It is contended that thus construed the Act of 1906 confers the privilege of naturalization without limitation as to race, since the general introductory words of § 4 are: " That an alien may be admitted to become a citizen of the United States in the following manner and not otherwise." But, obviously, this clause does not relate to the subject of eligibility but to the " manner," that is the procedure, to be followed. Exactly the same words are used to introduce the similar provisions contained in § 2165 of the Revised Statutes. In 1790 the first Naturalization Act provided that, "Any alien, *being a free white person,* . . . may be admitted to become a citizen, . . ." C. 3, 1 Stat. 103. This was subsequently enlarged to include aliens of African nativity and persons of African descent. These provisions were restated in the Revised Statutes, so that § 2165 included only the procedural portion, while the substantive parts were carried into a separate section (2169) and the words "An alien " substituted for the words "Any alien."

In all of the Naturalization Acts from 1790 to 1906 the privilege of naturalization was confined to white persons

(with the addition in 1870 of those of African nativity and descent), although the exact wording of the various statutes was not always the same. If Congress in 1906 desired to alter a rule so well and so long established, it may be assumed that its purpose would have been definitely disclosed and its legislation to that end put in unmistakable terms.

The argument that because § 2169 is in terms made applicable only to the title in which it is found, it should now be confined to the unrepealed sections of that title is not convincing. The persons entitled to naturalization under these unrepealed sections include only honorably discharged soldiers and seamen who have served three years on board an American vessel, both of whom were entitled from the beginning to admission on more generous terms than were accorded to other aliens. It is not conceivable that Congress would deliberately have allowed the racial limitation to continue as to soldiers and seamen to whom the statute had accorded an especially favored status, and have removed it as to all other aliens. Such a construction can not be adopted unless it be unavoidable.

The division of the Revised Statutes into titles and chapters is chiefly a matter of convenience, and reference to a given title or chapter is simply a ready method of identifying the particular provisions which are meant. The provisions of Title XXX affected by the limitation of § 2169, originally embraced the whole subject of naturalization of aliens. The generality of the words in § 2165, "An alien may be admitted . . . " was restricted by § 2169 in common with the other provisions of the title. The words " this Title " were used for the purpose of identifying that provision (and others), but it was the *provision* which was restricted. That provision having been amended and carried into the Act of 1906, § 2169 being left intact and unrepealed, it will require some-

45646°—23——13

thing more persuasive than a narrowly literal reading of the identifying words " this Title " to justify the conclusion that Congress intended the restriction to be no longer applicable to the provision.

It is the duty of this Court to give effect to the intent of Congress. Primarily this intent is ascertained by giving the words their natural significance, but if this leads to an unreasonable result plainly at variance with the policy of the legislation as a whole, we must examine the matter further. We may then look to the reason of the enactment and inquire into its antecedent history and give it effect in accordance with its design and purpose, sacrificing, if necessary, the literal meaning in order that the purpose may not fail. See *Holy Trinity Church v. United States*, 143 U. S. 457; *Heydenfeldt* v. *Daney Gold Mining Co.*, 93 U. S. 634, 638. We are asked to conclude that Congress, without the consideration or recommendation of any committee, without a suggestion as to the effect, or a word of debate as to the desirability, of so fundamental a change, nevertheless, by failing to alter the identifying words of § 2169, which section we may assume was continued for some serious purpose, has radically modified a statute always theretofore maintained and considered as of great importance. It is inconceivable that a rule in force from the beginning of the Government, a part of our history as well as our law, welded into the structure of our national polity by a century of legislative and administrative acts and judicial decisions, would have been deprived of its force in such dubious and casual fashion. We are, therefore, constrained to hold that the Act of 1906 is limited by the provisions of § 2169 of the Revised Statutes.

Second. This brings us to inquire whether, under § 2169, the appellant is eligible to naturalization. The language of the naturalization laws from 1790 to 1870 had been uniformly such as to deny the privilege of

naturalization to an alien unless he came within the description " free white person." By § 7 of the Act of July 14, 1870, c. 254, 16 Stat. 254, 256, the naturalization laws were " extended to aliens of African nativity and to persons of African descent." Section 2169 of the Revised Statutes, as already pointed out, restricts the privilege to the same classes of persons, viz: " to aliens [being free white persons, and to aliens] of African nativity and persons of African descent." It is true that in the first edition of the Revised Statutes of 1873 the words in brackets, " being free white persons, and to aliens " were omitted, but this was clearly an error of the compilers and was corrected by the subsequent legislation of 1875 (c. 80, 18 Stat. 316, 318). Is appellant, therefore, a " free white person," within the meaning of that phrase as found in the statute?

On behalf of the appellant it is urged that we should give to this phrase the meaning which it had in the minds of its original framers in 1790 and that it was employed by them for the sole purpose of excluding the black or African race and the Indians then inhabiting this country. It may be true that these two races were alone thought of as being excluded, but to say that they were the only ones within the intent of the statute would be to ignore the affirmative form of the legislation. The provision is not that Negroes and Indians shall be *excluded* but it is, in effect, that only free white persons shall be *included.* The intention was to confer the privilege of citizenship upon that class of persons whom the fathers knew as white, and to deny it to all who could not be so classified. It is not enough to say that the framers did not have in mind the brown or yellow races of Asia. It is necessary to go farther and be able to say that had these particular races been suggested the language of the act would have been so varied as to include them within its privileges. As said by Chief Justice Marshall in *Dartmouth College*

v. *Woodward,* 4 Wheat. 518, 644, in deciding a question of constitutional construction: " It is not enough to say, that this particular case was not in the mind of the convention, when the article was framed, nor of the American people, when it was adopted. It is necessary to go further, and to say that, had this particular case been suggested, the language would have been so varied, as to exclude it, or it would have been made a special exception. The case being within the words of the rule, must be within its operation likewise, unless there be something in the literal construction, so obviously absurd, or mischievous, or repugnant to the general spirit of the instrument, as to justify those who expound the constitution in making it an exception." If it be assumed that the opinion of the framers was that the only persons who would fall outside the designation " white " were Negroes and Indians, this would go no farther than to demonstrate their lack of sufficient information to enable them to foresee precisely who would be excluded by that term in the subsequent administration of the statute. It is not important in construing their words to consider the extent of their ethnological knowledge or whether they thought that under the statute the only persons who would be denied naturalization would be Negroes and Indians. It is sufficient to ascertain whom they intended to include and having ascertained that it follows, as a necessary corollary, that all others are to be excluded.

The question then is, Who are comprehended within the phrase " free white persons? " Undoubtedly the word " free " was originally used in recognition of the fact that slavery then existed and that some white persons occupied that status. The word, however, has long since ceased to have any practical significance and may now be disregarded.

We have been furnished with elaborate briefs in which the meaning of the words ' white person " is discussed

with ability and at length, both from the standpoint of judicial decision and from that of the science of ethnology. It does not seem to us necessary, however, to follow counsel in their extensive researches in these fields. It is sufficient to note the fact that these decisions are, in substance, to the effect that the words import a racial and not an individual test, and with this conclusion, fortified as it is by reason and authority, we entirely agree. Manifestly, the test afforded by the mere color of the skin of each individual is impracticable as that differs greatly among persons of the same race, even among Anglo-Saxons, ranging by imperceptible gradations from the fair blond to the swarthy brunette, the latter being darker than many of the lighter hued persons of the brown or yellow races. Hence to adopt the color test alone would result in a confused overlapping of races and a gradual merging of one into the other, without any practical line of separation. Beginning with the decision of Circuit Judge Sawyer, in *In re Ah Yup,* 5 Sawy. 155 (1878), the federal and state courts, in an almost unbroken line, have held that the words " white person " were meant to indicate only a person of what is popularly known as the Caucasian race. Among these decisions, see for example: *In re Camille,* 6 Fed. 256; *In re Saito,* 62 Fed. 126; *In re Nian,* 6 Utah, 259; *In re Kumagai,* 163 Fed. 922; *In re Yamashita,* 30 Wash. 234, 237; *In re Ellis,* 179 Fed. 1002; *In re Mozumdar,* 207 Fed. 115, 117; *In re Singh,* 257 Fed. 209, 211–212; and *Petition of Charr,* 273 Fed. 207. With the conclusion reached in these several decisions we see no reason to differ. Moreover, that conclusion has become so well established by judicial and executive concurrence and legislative acquiescence that we should not at this late day feel at liberty to disturb it, in the absence of reasons far more cogent than any that have been suggested. *United States* v. *Midwest Oil Co.,* 236 U. S. 459, 472.

The determination that the words " white person " are synonymous with the words " a person of the Caucasian race " simplifies the problem, although it does not entirely dispose of it. Controversies have arisen and will no doubt arise again in respect of the proper classification of individuals in border line cases. The effect of the conclusion that the words " white person " mean a Caucasian is not to establish a sharp line of demarcation between those who are entitled and those who are not entitled to naturalization, but rather a zone of more or less debatable ground outside of which, upon the one hand, are those clearly eligible, and outside of which, upon the other hand, are those clearly ineligible for citizenship. Individual cases falling within this zone must be determined as they arise from time to time by what this Court has called, in another connection (*Davidson* v. *New Orleans,* 96 U. S. 97, 104) " the gradual process of judicial inclusion and exclusion."

The appellant, in the case now under consideration, however, is clearly of a race which is not Caucasian and therefore belongs entirely outside the zone on the negative side. A large number of the federal and state courts have so decided and we find no reported case definitely to the contrary. These decisions are sustained by numerous scientific authorities, which we do not deem it necessary to review. We think these decisions are right and so hold.

The briefs filed on behalf of appellant refer in complimentary terms to the culture and enlightenment of the Japanese people, and with this estimate we have no reason to disagree; but these are matters which cannot enter into our consideration of the questions here at issue. We have no function in the matter other than to ascertain the will of Congress and declare it. Of course there is not implied—either in the legislation or in our interpretation of it—any suggestion of individual unworthiness or racial inferiority. These considerations are in no manner involved.

The questions submitted are, therefore, answered as follows:

Question No. 1. The Act of June 29, 1906, is not complete in itself but is limited by § 2169 of the Revised Statutes of the United States.

Question No. 2. No.

Question No. 3. No.

*It will be so certified.*