## WADIA v. UNITED STATES.
### No. 162.

Circuit Court of Appeals, Second Circuit.

Jan. 9, 1939.

James H. Black, of New York City, for appellant.

Lamar Hardy, U. S. Atty., of New York City (Clarence W. Roberts, Asst. U. S. Atty., of New York City, of counsel), for the United States.

Before MANTON, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

The appellant Wadia filed a petition in the United States District Court for the Southern District of New York to become a citizen of the United States. The proofs disclosed that he was born in Bombay, India, on December 28, 1899, and was the son of parents who were each born in India and that his parents were of the Parsee race, as well as himself. He emigrated to the United States in 1923 and had lived in various cities in this country ever since his arrival. On July 7, 1928, he married Gladys Voorhees, who was born in Buffalo, September 10, 1903, and two children were born of the marriage in New York City. His place of residence at the time of making his application for naturalization was No. 15 Charlton St., New York City, where he was living with his wife and children, his occupation was that of a life insurance agent and substitute teacher and in religion he was a follower of Zoroaster.

Objection to admission of the applicant was made by the District Director of Naturalization on the ground that he was a Parsee and as such was racially ineligible to citizenship under the provisions of Section 2169, United States Revised Statutes, 8 U.S.C.A. § 359. His petition for naturalization was denied by Judge Caffey and from the order denying it the present appeal was taken. We think that the decision of the District Court was right and should be affirmed.

Section 2169, 8 U.S.C.A. § 359, limits naturalization "to aliens being free white persons, and to aliens of African nativity and to persons of African descent". The question is whether the applicant, who is a Parsee, born in India of Parsee parents, is a "free white person" within the meaning of the statute. The record before us contains nothing in the way of ethnological or historical data and any reasoning based upon such matters must result from taking judicial notice of the work of scholars which has been incorporated in their writings or collected in encyclopedias or in judicial opinions.

In United States v. Balsara, 2 Cir., 180 F. 694, we held that a Parsee, whom Judge Lacombe had admitted to citizenship, (In re Balsara, C.C., 171 F. 294), was a "free white person" and Judge Ward, who wrote the opinion, said [page 696]: "We think that the words refer to race and include all persons of the white race, as distinguished from the black, red, yellow, or brown races, which differ in so many respects from it. Whether there is any pure white race and what peoples belong to it

may involve nice discriminations, but for practical purposes there is no difficulty in saying that the Chinese, Japanese, and Malays and the American Indians do not belong to the white race. Difficult questions may arise and Congress may have to settle them by more specific legislation, but in our opinion the Parsees do belong to the white race and the Circuit Court properly admitted Balsara to citizenship."

In substance the Balsara decision was that the words "free white persons" conferred the privilege of naturalization upon members of the Caucasian race. There a Parsee, and in Re Halladjian, C.C., 174 F. 834, an Armenian from Syria, was admitted on the ground that irrespective of any question of the color of the individual applicant he was of the Caucasian race and was thus properly classified as white.

In Ozawa v. United States, 260 U.S. 178, 43 S.Ct. 65, 67 L.Ed. 199, the Supreme Court seems to have approached the problem of defining "free white person" in a somewhat different way from that of Judge Ward in United States v. Balsara, 2 Cir., 180 F. 694, and of Judge Lowell in Re Halladjian, C.C., 174 F. 834. While it still regarded race, rather than the color of the particular applicant, as the important thing, it took the view that naturalization depended on whether he belonged to a race that would have been comprehended in the definition had the question of naturalization of its members been suggested to Congress at the time of the enactment of the first naturalization law in 1790, 1 Stat. 103, in which the phrase "free white persons" was used. Doubtless at that time there was little or no thought of the admission of immigrants who did not come from Great Britain, Germany, Sweden, Norway, France or Holland, owing to the trifling immigration in those days from other countries. But naturally persons indigenous to Spain, Italy, Russia and other European nations were regarded as within the meaning of the words as soon as they sought to immigrate, although some of their inhabitants were of dark complexions and even in the case of certain Russians of a Mongolian caste of countenance. The Supreme Court declined to rely upon ethnological or historical reasoning and, while suggesting that the term Caucasian in its scientific use did not afford a satisfactory racial definition of "white persons", held that a Japanese (who was not a Caucasian) was not a white person within the meaning of the act.

The Supreme Court again undertook to determine the meaning of the words "free white persons" in United States v. Bhagat Singh Thind, 261 U.S. 204, 43 S.Ct. 338, 341, 67 L.Ed. 616. There the applicant was a high caste Hindu of full Indian blood, born at Amrit Sar, Punjab, India. The court held that he was not a "white person" within the meaning of Revised Statute Section 2169. The court said:

"The words of the statute are to be interpreted in accordance with the understanding of the common man from whose vocabulary they were taken. * * *

"They imply, as we have said, a racial test; but the term 'race' is one which, for the practical purposes of the statute, must be applied to a group of living persons now possessing in common the requisite characteristics, not to groups of persons who are supposed to be or really are descended from some remote, common ancestor, but who, whether they both resemble him to a greater or less extent, have, at any rate, ceased altogether to resemble one another. It may be true that the blond Scandinavian and the brown Hindu have a common ancestor in the dim reaches of antiquity, but the average man knows perfectly well that there are unmistakable and profound differences between them to-day; and it is not impossible, if that common ancestor could be materialized in the flesh, we should discover that he was himself sufficiently differentiated from both of his descendants to preclude his racial classification with either. The question for determination is not, therefore, whether by the speculative process of ethnological reasoning we may present a probability to the scientific mind that they have the same origin, but whether we can satisfy the common understanding that they are now the same or sufficiently the same to justify the interpreters of a statute—written in the words of common speech, for common understanding, by unscientific men—in classifying them together in the statutory category as white persons."

The opinion then went on to say that the term Aryan and the word Caucasian furnished unsatisfactory bases for defining the meaning of "white persons". Justice Sutherland, who wrote the opinion, apparently regarded the word Caucasian as including European stock but said:

"What, if any, people of primarily Asiatic stock come within the words of the section we do not deem it necessary now to decide. There is much in the origin and

historic development of the statute to suggest that no Asiatic whatever was included. * * *

"What we now hold is that the words 'free white persons' are words of common speech, to be interpreted in accordance with the understanding of the common man, synonymous with the word 'Caucasian' only as that word is popularly understood. As so understood and used, whatever may be the speculations of the ethnologist, it does not include the body of people to whom the appellee belongs. It is a matter of familiar observation and knowledge that the physical group characteristics of the Hindus render them readily distinguishable from the various groups of persons in this country commonly recognized as white."

A Parsee of a race which immigrated from Persia to India some 1,200 years ago, even though retaining, as is claimed, blood differing little, if any, from that of its original ancestors, can hardly be differentiated in the mind of the common man from that of the Hindus beside whom the Parsees have lived for 1,200 years. Each stock is Caucasian. The language of each is of Aryan origin, but neither can properly be classed as "white persons" in view of the decision in United States v. Bhagat Singh Thind, 261 U.S. 204, 43 S.Ct. 338, 67 L.Ed. 616.

In Ozawa v. United States, 260 U.S. 178, 198, 43 S.Ct. 65, 69, 67 L.Ed. 199, Justice Sutherland said: "Individual cases * * * must be determined as they arise from time to time by * * * 'the gradual process of judicial inclusion and exclusion.'" Accordingly it is not altogether safe to generalize, yet it may fairly be said that members of races inhabiting Europe or living along the shores of the Mediterranean are ordinarily to be classed as "white persons" in construing the naturalization laws. The same thing may be true of some Asiatics whose long contiguity to European nations and assimilation with their culture has caused them to be thought of as of the same general characteristics.

Whatever might have been the case with a Parsee, if his stock had been directly derived from Persia, one whose ancestors have resided in India for 1,200 years cannot be regarded as of a race, the members of which are commonly thought of as "white persons". Thus in Re Feroz Din, D.C., 27 F.2d 568, Judge Bourquin held that an Afghan was not a "white person", and in United States v. Ali, D.C., 7 F.2d 728,

Judge Tuttle held that a pure blooded Arabian, who was a native of India and whose ancestors had lived there for several centuries, was not such a person, even though his Arabian blood had been kept pure by intermarriage only within the family. See, also, Morrison v. California, 291 U.S. 82, 85, 54 S.Ct. 281, 78 L.Ed. 664.

The order is affirmed.