H. W. Chadbourne *v.* United States (No. 4194)[1]

United States Court of Customs and Patent Appeals, June 15, 1939

*Sharretts & Hillis* (*Edward P. Sharretts* of counsel) for appellant.
*Webster J. Oliver*, Assistant Attorney General (*Richard E. FitzGibbon*, special attorney, of counsel), for the United States.

[Oral argument April 12, 1939, by Mr. Edward P. Sharretts and Mr. FitzGibbon]

Before Garrett, Presiding Judge, and Bland, Hatfield, Lenroot, and Jackson, Associate Judges

Jackson, Judge, delivered the opinion of the court:

Appellant brought suit in the United States Customs Court to recover a sum of money alleged to have been unlawfully exacted by the Collector of Customs of the port of New York in assessing and collecting customs duty on a pleasure yacht named *Heluis*.

The suit was tried in New York City before the Second Division of the said court and judgment was entered against appellant. From the judgment this appeal was taken.

---

C. A. D. 66.

Duty was levied upon the yacht at the rate of 30 per centum ad valorem under paragraph 370 of the Tariff Act of 1930 which reads as follows:

PAR. 370. Airplanes, hydroplanes, motor boats, and parts of the foregoing, 30 per centum ad valorem. The term "motor boat," when used in this Act, includes a yacht or pleasure boat, regardless of length or tonnage, whether sail, steam, or motor propelled, owned by a resident of the United States or brought into the United States for sale or charter to a resident thereof, whether or not such yacht or boat is brought into the United States under its own power, but does not include a yacht or boat used or intended to be used in trade or commerce, nor a yacht or boat built, or for the building of which a contract was entered into, prior to December 1, 1927.

Appellant claimed that the yacht is a nonimportation and that, therefore, the said paragraph does not apply.

The record consists of an agreed statement of facts among which appears the following:

The article before the Court consists of the yacht "Heluis" which arrived in the United States at San Juan, Puerto Rico, on July 10, 1932. It was then under Spanish registry and was owned and in the possession of Luis Martinez de las Rivas, a resident and citizen of Spain.

On December 14, 1933, the yacht was sold by Martinez de las Rivas to H. W. Chadbourne, a resident and citizen of the United States and the plaintiff herein, under bill of sale dated December 14, 1933.

From July 10, 1932, when the yacht arrived at San Juan, Puerto Rico, until December 14, 1933, when it was sold to H. W. Chadbourne and registered under the flag of the United States, the yacht was continuously under Spanish registry and owned and possessed by the said Martinez de las Rivas. The yacht is a pleasure yacht. It is not used or intended to be used in trade or commerce. It was not built nor was there a contract entered for the building thereof prior to December 1, 1927.

The contract for sale was entered into on July 15, 1933. This contract was modified on July 27, 1933, and the sale consummated as above stated on December 14, 1933.

The statement of facts contains also the itinerary of the yacht with the dates of arriving and leaving various ports of the United States and of the West Indies, from the time it left Las Palmas, Spain, May 21, 1932, until it arrived at New York, June 10, 1933, where it remained until sold to appellant December 14, 1933. The statement of facts also embraced the admission in evidence of several letters and telegrams to and from the owner concerning a sale or charter of the yacht, an affidavit of a firm of yacht brokers, and a list of seventeen yacht brokers with whom the yacht was listed for sale.

It appears that when the sale was consummated appellant applied to the Marine Division of the New York Customs for documentation under United States registry. Action on the application was suspended awaiting a deposit to cover duty on the yacht. Thereupon, the yacht was entered for duty, classified as aforesaid, and duty was paid.

Sometime prior to February 4, 1933, a firm of New York yacht brokers communicated with the owner of the yacht inquiring if it was for sale or charter. On February 4, 1933, the wife of the owner, answering the communication, wrote from Nassau, N. P. Bahamas, at the request of her husband, that he might consider selling the yacht if he received a good offer and that in the meantime he would like to charter the yacht. Through the month of April 1933 there were several communications between the owner and the said brokers with respect to chartering the yacht and apparently it would have been chartered had the price asked by the owner not been considered too high for the clients of the brokers. It is also reasonable to assume that the yacht would have been sold had a good offer been received.

After cruising the southern waters the yacht arrived in the port of New York on June 10, 1933. During the last week of June 1933 it was placed for sale on the list of a firm of yacht brokers who on July 9, 1933, listed it for sale with seventeen other yacht brokers.

We are of opinion that the yacht was brought into the port of New York on June 10, 1933, for the purpose of selling it. The record cannot lead us to any other reasonable conclusion. Long before June 10, 1933, the then owner suggested its sale to anyone who would pay the price at which it was held. It was also offered for charter at a price. Shortly after it arrived, it was put up on the brokers' lists for sale. Surely it cannot be said that the owner did not offer it for sale or charter before it came into New York. Certainly there is nothing that would tend, even in the slightest degree, to indicate that he had changed his mind from the date of the letter of February 4, 1933, up to the last week in June of that year when the yacht was formally listed for sale.

Appellant contends that the yacht was not an importation in a tariff sense unless at the time it was brought into New York the owner intended to sell it to him. It is urged that such is the plain intent of the statute. Since the vessel was listed for sale as above set out, it is clear that the owner intended to sell it to anyone, including a nonresident.

The statute might be read in such a way as to indicate that a yacht brought into an American port, with intent to sell to any purchaser and finally sold to a resident of the United States is not dutiable. This interpretation, however, seems to us to be at variance with the policy of the legislation as a whole. It would, we think, be an anomalous situation if one resident of the United States could purchase a yacht such as the *Helvis* at an open sale without payment of duty while another such resident would be compelled to pay duty for the reason that the vessel had been brought in for sale to him.

Furthermore, we may take judicial notice that shipbuilding is an industry of importance in the United States. Many American

workers labor in the production of large ocean-going yachts such as the *Heluis*, from miners, lumbermen and the like, producing raw materials, to designers and skilled artisans who combine the materials into the finished article. If the contention of appellant is correct, it would seem that the purpose of the tariff act "to encourage the industries of the United States" and to "protect American labor" would be thwarted.

A literal interpretation of the statute, we think, does not disclose the intent of Congress, in view of what we have heretofore said, and we, therefore, examine the congressional history behind the statute to aid us in its construction. It is the duty of the courts to do so. As was said in the case of *Takao Ozawa* v. *United States*, 260 U. S. 178, 194:

It is the duty of this Court to give effect to the intent of Congress. Primarily this intent is acertained by giving the words their natural significance, but if this leads to an unreasonable result plainly at variance with the policy of the legislation as a whole, we must examine the matter further. We may then look to the reason of the enactment and inquire into its antecedent history and give it effect in accordance with its design and purpose, sacrificing, if necessary, the literal meaning in order that the purpose may not fail. * * *

The definition of "motor boat" set out in paragraph 370, *supra*, had its genesis in the Revenue Act of 1928. The Revenue Act of 1926 contained a provision for a special excise tax upon "* * * the use of yachts * * * and motor boats with fixed engines, if foreign built * * *" over five net tons and over thirty-two feet in length, not used exclusively for trade, fishing, or national defense. This tax was imposed upon *all* such vessels, except those used without profit by any benevolent, charitable, or religious organization, exclusively for furnishing aid, comfort, or relief to seamen, or which were owned on January 1, 1926, by a citizen of the United States or a domestic partnership or corporation. When the bill which became the 1928 revenue act was being considered, the House increased the said excise tax by 500 per centum. Certain representations were made to the Senate, which by amendment repealed the excise tax provision. It was pointed out in debate on the floor of the Senate that the boats would then be subject to customs duty under paragraph 370 of the Tariff Act of 1922 and that some sort of clarifying provision would be worked out. Said paragraph 370 reads:

PAR. 370. Airplanes, hydroplanes, motor boats and parts of the foregoing, 30 per centum ad valorem.

In working out a clarifying provision, Senator Reed, of Pennsylvania, offered an amendment on the floor of the Senate defining the term "motor boat" which definition is substantially identical with the instant provision of paragraph 370 of the Tariff Act of 1930, as far as the language sought to be construed is concerned. In explaining the amendment, Senator Reed said:

Mr. President, I do not know whether it can be fairly called a tariff amendment or not, but it ought to be considered by the conferees in connection with the repeal of the tax on foreign-built yachts.

There is in the House bill an annual license tax on foreign-built yachts which, because of certain complications under the treaty with Germany, was stricken out by the Finance Committee. If it is to be stricken out, and if the present decision of the Supreme Court is to stand, that a yacht which enters our waters under its own power is not an article of commerce but an instrumentality of commerce, then the conferees ought to be free somehow to define the term "instrumentality of commerce." In that sense, I presume it is fair to call the amendment a tariff amendment, *but what we are trying to do is to accomplish the end on which we all agree, to continue the tax on foreign-built yachts and still not violate the treaty with Germany.* [Italics ours.]

The House agreed to the Senate amendment, and the Revenue Act of 1928 as it was passed applied the said definition of "motor boat" to the Tariff Act of 1922. When the Tariff Act of 1930 was being prepared the definition was incorporated into paragraph 370 thereof.

We are of opinion that in the light of the antecedent history of the involved paragraph, it was the intent of Congress to assess duty upon foreign-built yachts, such as the *Heluis*, when brought into the United States for sale, and sold to a resident of the United States. To assess duty upon such a vessel when sold to a nonresident might contravene treaty obligations, and this appears to be the only reason why the words "a resident" of the United States were used in the paragraph.

It is clear that the intent of Congress in enacting paragraph 370 of the Tariff Act of 1930 was to encourage domestic industry and to protect American labor as well as to provide revenue. Obviously, if the contention of appellant were sustained, the intent of Congress would be nullified.

For the foregoing reasons the judgment appealed from is *affirmed.*