In re the **INVESTMENT BANKERS, INC.,** Debtor.

**James H. TURNER, Trustee,** Plaintiff,

v.

**DAVIS, GILLENWATER & LYNCH, Gilbert K. Davis, individually and as a partner of Davis, Gillenwater & Lynch, and O'Connor & Hannan, a partnership,** Defendants.

Civ. A. No. 86–C–1945.
Adv. No. 82–M–0087.

United States District Court,
D. Colorado.

Oct. 5, 1989.

On Motion to Amend and Supplement
May 15, 1990.

Robert E. Warren, Gorsuch, Kirgis, Campbell, Walker and Grover, Denver, Colo. and Josephine Wang, Gen. Counsel, Washington, D.C., for plaintiffs.

George W. Vaught, William Tucker, Tucker & Vaught, Denver, Colo., Robert T. Copeland, Copeland, Molinary & Bieger, Abington, Va., and Joe A. Walters and Larry D. Gallegos, O'Connor & Hannan, Denver, Colo., for defendants.

## ORDER

CARRIGAN, District Judge.

The Securities Investor Protection Corporation (hereinafter "SIPC") and James H. Turner, as trustee (hereinafter "Trustee") appealed from a bankruptcy court decision in an adversary proceeding. The SIPC ob-

jects to the bankruptcy court's determination that bankruptcy courts do not have jurisdiction over liquidations conducted pursuant to the Securities Investor Protection Act, 15 U.S.C. § 78aaa *et seq.* (hereinafter "SIPA"). The Trustee objects to the bankruptcy court's conclusion that a payment, made by The Investment Banker's, Inc. (hereinafter "IBI") to the law firm of O'Connor & Hannan, was not voidable as a preferential transfer under 11 U.S.C. § 547(b). Davis, Gillenwater & Lynch appeal the bankruptcy court's conclusion that two payments they received from IBI were voidable as preferential and fraudulent transfers under 11 U.S.C. §§ 547(b) and 548, respectively. O'Connor & Hannan assert that the bankruptcy court correctly determined that the payment they received from IBI fell within the voidable preference exception in 11 U.S.C. § 547(c)(2).

The adversary proceeding was filed by the Trustee during liquidation of IBI in order to recover payments for legal services allegedly voidable as preferential and fraudulent transfers under 11 U.S.C. §§ 547(b) and 548(a)(2), respectively. The Trustee was appointed under the Securities Investor Protection Act, 15 U.S.C. § 78aaa *et seq.* (hereinafter "SIPA"), and sued under the above cited sections of the Bankruptcy Code made applicable in a SIPA liquidation by 15 U.S.C. § 78fff(b).

The parties have fully briefed the issues and oral argument would not materially assist my decision. Jurisdiction exists pursuant to 28 U.S.C. § 158 (1988).

### Background.

IBI, a Colorado corporation, had acted as a securities broker dealer beginning October 23, 1980. The liquidation proceeding was commenced against the debtor, IBI, by the SIPC, pursuant to authority granted it in the SIPA. The proceeding seeking liquidation of IBI was commenced on July 10, 1981. The application for appointment of a receiver and trustee for the purpose of liquidating IBI was based upon the SIPC's determination that IBI had failed to meet its obligations to customers imposed by the SIPA. The SIPC also justified its decision to liquidate IBI upon its determination that

IBI was in violation of the "net capital" requirements of the Securities Exchange Act of 1934 and Rule 17 CFR 240.15C3–1.

In the order of July 15, 1981 appointing Turner as trustee, the liquidation proceeding was removed to the United States Bankruptcy Court for the District of Colorado, pursuant to § 5(b)(4) of SIPA, 15 U.S.C. § 78eee(b)(4) (Supp.1979). After removal to the bankruptcy court, Turner filed a complaint seeking to avoid the transfer of four checks totaling $87,517.80 to the law firms of Davis, Gillenwater & Lynch and O'Connor and Hannan. Those four checks are as follows:

(a) Check # 13417, dated July 10, 1981, payable to Gilbert K. Davis, Esquire, in the amount of $11,858.00;

(b) Check # 13418, dated July 10, 1981, payable to O'Connor & Hannan, in the amount of $25,659.80;

(c) Check # 13419, dated July 10, 1981, payable to O'Connor & Hannan Trust Account in the amount of $25,000.00;

(d) Check # 13432, dated July 10, 1981, payable to Gilbert K. Davis, Esquire, of Davis, Gillenwater & Lynch, in the amount of $25,000. (Bankruptcy Opinion at 2–4, Record at 303–05) (hereinafter "Op. at, R. at")

The bankruptcy court made the following findings of fact: On July 8, 1981, Gilbert Davis was contacted by a representative of IBI, to represent the debtor and two of its officers, Belknap and Chandler. Davis went to Denver with two other attorneys from Virginia. A fee of $10,000 was arranged, to be divided among the three attorneys. Conferences were held on July 8 through 10, 1981. The evidence indicates that the parties and these attorneys were aware during the entire course of Davis' representation, of at least the possibility that the SEC would file a liquidation proceeding and seek injunctive relief against IBI in the United States District Court. A $25,000 retainer was agreed upon for further work. The fee included Davis' appearance at the hearing of July 10, 1981 concerning the SEC's application for an injunction and the SIPC's action to liquidate IBI.

The evidence establishes that Davis received checks # 13417 and # 13432 at about noon on July 10, 1981. These were promptly exchanged for cashier's checks at the First National Bank of Denver. Davis claims that he did not learn of the SEC's action, that was commenced the same day, until after he had negotiated these checks.

O'Connor and Hannan had represented IBI since 1980. Of the two checks received by this firm, # 13418, was given to O'Connor and Hannan for previously rendered legal services. The second check, # 13419, was paid to O'Connor and Hannan as a retainer for legal services to be performed in connection with IBI's trading suspension. The O'Connor and Hannan checks were received at approximately 10:00 a.m. on July 10, 1984 and were cashed soon thereafter. These checks were taken to the bank immediately because O'Connor and Hannan had previously received an insufficient funds check from IBI.

I will address the following issues in the order presented.

(1) Whether bankruptcy judges were constitutionally appointed?

(2) Whether bankruptcy courts have jurisdiction over SIPA liquidations?

(3) Whether the payment of $25,659.80 to O'Connor & Hannan, check # 13418, fell within the voidable preference exception in 11 U.S.C. § 547(c)(2) as it existed before the Bankruptcy Amendments and Federal Judgeship Act of 1984?

(4) Whether the payment of $11,858.00 to Davis, Gillenwater & Lynch, check # 13417, constituted a voidable preference under 11 U.S.C. § 547(b)?

(5) Whether the payment of $25,000 to Davis, Gillenwater & Lynch, check # 13432, constituted a fraudulent transfer under 11 U.S.C. § 548(a)(2)?

Under Rule 8013, Rules of Bankruptcy Procedure,[1] the district court may

---

**1.** Bankruptcy Rule 8013 provides in pertinent part:

"On an appeal the district court ... may affirm, modify, or reverse a bankruptcy court's judgment, order, or decree or remand

affirm, modify, reverse or remand a bankruptcy court judgment. *In re Brown,* 68 B.R. 670 (D.Colo.1986). This procedural authority was stated by the *Brown* court as follows:

"[The District] Court is bound to accept the Bankruptcy Judge's findings of fact unless they are clearly erroneous. Similarly, due regard in this context must be given to the lower court's opportunity to hear firsthand the testimony of the witnesses. However, this same presumption does not apply to conclusions of law, and this Court may make an independent examination and determination of the ultimate legal conclusions to follow from the facts....

The 'clearly erroneous' standard was explained by the Supreme Court in *Comm. v. Duberstein,* 363 U.S. 278, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960), wherein the Court stated: 'A finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.... The rule itself applies also to factual inferences from undisputed basic facts ...'" *Id.* at 671 (citations omitted).

Thus, the bankruptcy court's factual findings are not to be disturbed on appeal unless they are clearly erroneous. However, the bankruptcy court's conclusions of law will be reviewed under a *de novo* standard. *In re Mullet,* 817 F.2d 677-79 (10th Cir.1987).

### The Constitutionality of the Bankruptcy Judges' Terms.

■ The Davis defendants first address the constitutionality of the bankruptcy judges' terms. (Davis brief, at 6). These defendants assert that the bankruptcy court did not have jurisdiction to hear this matter because when BAFJA became law all bankruptcy judge positions were vacant. They contend that this occurred because the Bankruptcy Act of 1978 expired on June 27, 1984 but the Bankruptcy Amendments and Federal Judgeship Act of 1984 (hereinafter "BAFJA")[2] was not signed into law until July 10, 1984. The Davis defendants further assert that BAFJA, sections 121(e)[3] and 106(a),[4] is an attempt by Congress to retroactively reinstate bankruptcy judges whose terms had expired on June 27, 1984, thus violating the Appointments Clause of the United States Constitution.[5]

Numerous courts interpreting the of BAFJA provisions that extended the terms of bankruptcy judges, have held that they did not violate the appointments clause. *See In re Sweetwater,* 55 B.R. 724, 726-28 (D.Utah 1985). The *Sweetwater* court stated:

"This court agrees with Judge Schnacke's conclusion in that case [*In re Benny,* 44 Bankr. 581, 587-88 (N.D.Cal 1984)] that there was no 'gap' between June 27, 1984, and July 10, 1984, during which the bankruptcy courts ceased to exist. The hold-over provisions of the 1978 Act, sections 404(b) and (d) (as amended), authorized the bankruptcy judges to continue in office until June 27, 1984, *or* until their successors were appointed or took office. Because no bankruptcy judges were appointed or took office between June 27 and July 10, 1984,

---

with instructions for further proceedings. Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses." This rule accords to the findings of a bankruptcy judge the same weight given the findings of a district judge under Rule 52, Fed.R.Civ.P. 9 *Collier on Bankruptcy,* ¶ 8013.01, at pp. 8013-1 (15th ed. 1988).

2. Pub.L. No. 98-353, 98 Stat. 333 (1984).

3. Section 121(e) of BAFJA provides: "The term of office of any bankruptcy judge who was

serving on June 27, 1984, is extended to and shall expire at the end of the day of enactment of this Act."

4. Section 106(a) of BAFJA provides: "The term of an office of a bankruptcy judge who is serving on the date of the enactment of this Act is extended to and expires four years after the date such bankruptcy judge was last appointed to such office or on October 1, 1986, whichever is later."

5. U.S. Const. art. II, § 2, cl. 2.

the bankruptcy judges serving on June 27, 1984, continued in office at least until July 10, 1984. Thus, the 1984 Act is not constitutionally infirm. It did not 'appoint' interim bankruptcy judges, in violation of the appointments clause, because there were no vacant offices to appoint them to. Neither was it an impermissible retroactive extension of the bankruptcy judges' offices, since their offices had not expired at the time the act was passed." *Id.* at 727.

*Accord: In re Production Steel, Inc.,* 48 B.R. 841, 846–49 (M.D.Tenn.1985); *In re Moody,* 46 B.R. 231, 233 (M.D.N.C.1985); *In re Tom Carter Enterprises, Inc.,* 44 B.R. 605, 607–08 (C.D.Cal.1984); *In re Benny,* 44 B.R. 581, 587–88 (N.D.Cal.1984); *In re Western World Funding, Inc.,* 52 B.R. 743, 762 (Bankr.D.Nev.1985); *Matter of Baldwin–United Corp,* 48 B.R. 49, 53 (Bankr.S.D. Ohio 1985). The defendants have not cited any case holding that BAFJA is unconstitutional. Therefore, the defendants' position is untenable and I uphold the constitutionality of BAFJA.

### Bankruptcy Court Jurisdiction Over SIPA Liquidations.

■ The bankruptcy court concluded that BAFJA deprived it of jurisdiction over SIPA liquidations. (Op. at 18, R. at 319) [6] The Davis defendants assert that the bankruptcy court erred in determining that it had jurisdiction to adjudicate preferential and fraudulent transfer actions brought by the trustee. (Davis brief, at 10–12). I need not reach this issue, however, if I conclude that the bankruptcy court erred by concluding that bankruptcy courts lack jurisdiction over SIPA liquidations. If bankruptcy courts have the authority to preside over SIPA liquidations, they must be able to apply 11 U.S.C. §§ 547 and 548 (sections of the bankruptcy code allowing the trustee to set aside preferential and fraudulent transfers) made applicable in SIPA liquidations by 15 U.S.C. § 78fff(b),

in order to effectively carry out the liquidation.

From the bankruptcy court's perspective, 28 U.S.C. § 157 repeals by implication 15 U.S.C. § 78eee(b)(4). Section 157 defines the jurisdiction of bankruptcy courts. It provides:

"(a) Each district court may provide that any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 shall be referred to the bankruptcy judges for the district.

(b)(1) Bankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11, referred under subsection (a) of this section, and may enter appropriate orders and judgments, subject to review under § 158 of this title."

Title 15 U.S.C. § 78eee(b)(4), on the other hand, is the section of SIPA that authorizes the removal of SIPA liquidations to bankruptcy court. It provides:

"REMOVAL TO BANKRUPTCY COURT.

Upon the issuance of a protective decree and appointment of a trustee, or a trustee and counsel, under this section, the court shall forthwith order the removal of the entire liquidation proceeding to the court of the United States in the same judicial district having jurisdiction over cases under title 11. The latter court shall thereupon have all of the jurisdiction, powers, and duties conferred by this chapter upon the court to which application for the issuance of the protective decree was made."

The bankruptcy court reasoned that SIPA matters arise under title 15 and are not "cases under title 11" nor proceedings "arising under" or "arising in or related to a case under title 11." (Op. at 14, R. at 315). The court engaged in an extremely

---

**6.** It must be noted that while the bankruptcy court held that it lacked jurisdiction over SIPA liquidations it still proceeded to rule on the remaining issues. The court stated: "recognizing that legal analysis and authority has previously been strained and stretched to save the bankruptcy court system where Congress has failed to act, it is possible that, on appeal, analysis by an appellate court may create authority where I have found none to exist." (Op. at 18, R. at 319).

literal interpretation of the two statutes; because BAFJA vests exclusive jurisdiction of title 11 cases in the district courts, a strict reading of section 78eee(b)(4) would require a district court to remove a SIPA liquidation to itself. The bankruptcy court concluded that this interpretation would result in absurdity. (Op. at 16, R. at 317).

█ Although literally, it appears that BAFJA renders 15 U.S.C. § 78eee(b)(4) meaningless, a court is required to avoid interpretations of statutes that result in "self-nullification" or an unreasonable result. In *Takao Ozawa v. United States,* 260 U.S. 178, 43 S.Ct. 65, 67 L.Ed. 199 (1922), the United States Supreme Court stated:

> "It is the duty of this Court to give effect to the intent of Congress. Primarily this intent is ascertained by giving the words their natural significance, but if this leads to an unreasonable result plainly at variance with the policy of the legislation as a whole, we must examine the matter further. We may then look to the reason of the enactment and inquire into its antecedent history and give it effect in accordance with its design and purpose, sacrificing, if necessary, the literal meaning in order that the purpose may not fail." *Id.* at 194, 43 S.Ct. at 68.

Additional rules of statutory construction also mandate that this court not interpret BAFJA as repealing 15 U.S.C. § 78eee(b)(4). *See Watt v. Alaska,* 451 U.S. 259, 101 S.Ct. 1673, 68 L.Ed.2d 80 (1981). *Watt* stated:

> "Without depreciating this general rule, [that the more recent of two irreconcilably conflicting statutes governs] we decline to read the statutes as being in irreconcilable conflict without seeking to ascertain the actual intent of Congress. Our examination of the legislative history is guided by another maxim: 'repeals by implication are not favored.' *Morton v. Mancari,* 417 U.S. [535], at 549 [94 S.Ct. 2474, at 2482, 41 L.Ed.2d 290] [(1974)], quoting *Posadas v. National City Bank,* 296 U.S. 497, 503 [56 S.Ct. 349, 352, 80 L.Ed. 351] (1936). 'The intention of the legislature to repeal must be clear and manifest....' We must

read the statutes to give effect to each if we can do so while preserving their sense and purpose." *Id.* 451 U.S. at 266–67, 101 S.Ct. at 1678 (citations omitted).

Because repeals by implication are not favored, absent a clear legislative intent to repeal, a repeal by implication may be found only if there is a "manifest inconsistency" or "positive repugnance" between two statutes. *Mercantile National Bank v. Langdeau,* 371 U.S. 555, 565, 83 S.Ct. 520, 526, 9 L.Ed.2d 523 (1963) (citing *United States v. Borden Co.,* 308 U.S. 188, 198–99, 60 S.Ct. 182, 188–89, 84 L.Ed. 181 (1939)). On the same subject, *Morton* stated:

> "In the absence of some affirmative showing of an intention to repeal, the only permissible justification for a repeal by implication is when the earlier and later statutes are irreconcilable.... Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment." *Morton v. Mancari,* 417 U.S. 535, at 550–51, 94 S.Ct. 2474, at 2482–83, 41 L.Ed.2d 290 (1974).

In the instant case, I can find no evidence of any intention by Congress for BAFJA to repeal SIPA. Federal district courts have long engaged in the practice of referring SIPA liquidations to bankruptcy courts.

In *Exchange National Bank of Chicago v. Wyatt,* 517 F.2d 453 (2d Cir.1975), the Second Circuit concluded that the referral of SIPA proceedings to the bankruptcy courts effectuated the purposes of SIPA. It is important to note that the court came to this conclusion while interpreting SIPA before it contained any of the direct removal provision that it now contains in 15 U.S.C. § 78eee(b)(4). The court emphasized that the power of the district court to refer SIPA proceedings to referees in bankruptcy was not only "consistent with the purposes of SIPA but essential." *Id.* at 457. The court went on to state:

> "The process for the determination of ["customer"] claims [in a SIPA proceeding] did not differ in any significant re-

spect from what would have been required in a large stockbroker bankruptcy before enactment of SIPA; ... This is the kind of business for which bankruptcy judges have developed special expertness and administrative skills and which Congress did not intend to dump on already overburdened district courts with needed clerical and other facilities." *Id.* at 457–58.

In a more recent decision, the Second Circuit affirmed its preference that SIPA liquidations be processed in bankruptcy court. *See S.E.C. v. American Board of Trade, Inc.*, 830 F.2d 431, 436 (2d Cir. 1987).[7] The court emphasized that "[w]e are, however, disturbed by the subsequent use of the receivership to effect the liquidation of the ABT entities." *Id.* at 436. After reviewing three of its former decisions where the court had expressed similar reservations,[8] the court stated:

> "[T]he functions undertaken by the district court in this case demonstrate the wisdom of **not using a receivership as a substitute for bankruptcy**.... [T]he district court essentially transformed itself into a court of bankruptcy aided by a receiver performing the tasks of a bankruptcy trustee. For example, the court has taken upon itself the burden of processing proof-of-claim forms filed by thousands of noteholders and other creditors, of setting priorities among classes of creditors, and of administering sales of real property, all without the aid of either the experience of a bankruptcy judge or the guidance of the bankruptcy code.... We now state, however, that in actions of the present kind brought in the future by the SEC, we expect counsel for the agency, as an officer of the court and as part of his or her individual professional responsibility, to bring our views, as stated in this and other decisions, to the attention of the district court before the court embarks on a liq-

uidation through an equity receivership." *Id.* at 437–38 (emphasis added).

Because I find no "manifest inconsistency" or "positive repugnancy" and do not find that BAFJA and SIPA are irreconcilable, I adopt the Second Circuit's reasoning set forth in the line of cases relied on and culminating in *S.E.C. v. American Board of Trade, Inc.*, to the effect that bankruptcy courts are the tribunals best equipped to preside over SIPA liquidations and are authorized to do so.

In enacting BAFJA, Congress did not expressly repeal 15 U.S.C. §§ 78eee or 78fff. I decline to hold that a repeal by implication occurred in this instance. Absent express language to the contrary I conclude that Congress intended these sections of SIPA to remain in force after BAFJA and that Congress intended that SIPA liquidations be conducted in bankruptcy courts. Furthermore, I conclude that, although a bankruptcy removal under 28 U.S.C. § 157 is discretionary with the district court, and a SIPA liquidation removal under 15 U.S.C. § 78eee(b)(4) appears mandatory by its language, the difference is insignificant. As a practical matter all bankruptcy cases can be removed even though they can be withdrawn pursuant to 28 U.S.C. § 157(d). By reconciling BAFJA and SIPA, removal of SIPA liquidations can be accomplished at the discretion of the district court and thereby fulfill the intent of Congress in BAFJA to place supervision of bankruptcy courts in the district courts.

### Payment of $25,659.80 to O'Connor & Hannan—Check #13418.

The bankruptcy court concluded that check #13418, paid to O'Connor & Hannan, was not voidable as a preferential transfer because it fell within the exception in 11 U.S.C. § 547(c)(2). (Op. at 23, R. at 324). The Trustee presents a compelling argument that all the elements of a preferential transfer under 11 U.S.C. § 547(b)

---

**7.** For an excellent discussion of *S.E.C. v. American Board of Trade, Inc.* see Sabino, *The Role of Bankruptcy Courts in Stockbrokerage Liquidations,* 16 Sec.Reg.L.J. 227 (1988).

**8.** The court reviewed and quoted its decisions in *Esbitt v. Dutch–American Mercantile Corp.,* 335 F.2d 141 (2d Cir.1964); *SEC v. S & P National Corp.,* 360 F.2d 741 (2d Cir.1966); and *Lankenau v. Coggeshall & Hicks,* 350 F.2d 61 (2d Cir.1965).

exist with regard to this payment. I need only reach this issue if all the elements of the exception found in 11 U.S.C. § 547(c)(2) are not present.

■ In order for the exception set out in 11 U.S.C. § 547(c)(2) to apply, the following elements must exist with regard to the transfer:

(1) The transfer must be made in payment of a debt incurred in the ordinary course of business or financial affairs of the debtor and the transferee;

(2) The transfer must be made not later than 45 days after such debt was incurred;

(3) The transfer must be made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(4) The transfer must be made according to ordinary business terms.

It is important to note that BAFJA deleted the forty-five day requirement of 11 U.S.C. § 547(c)(2). However, in this case the forty-five day limit applies because the case was filed on July 10, 1981. BAFJA explicitly states that it will only apply to cases filed within 90 days after July 10, 1984. BAFJA, Pub.L. 98–353, § 553(a), 98 Stat. 392 (1984). 1984 U.S.Code Cong. and Admin.News, p. 576.

■ The bankruptcy court found that: "[t]he services rendered which are represented by Check No. 13418 were for legal services rendered prior to and not in contemplation of or in connection with the SIPA action." (Op. at 22, R. 323). The court also found that O'Connor and Hannan had represented IBI since 1980. (Op. at 9, R. at 310). Therefore, I hold that these debts were incurred in the ordinary

course of business. I will next consider the third and fourth elements and later return to the second.

■ The bankruptcy court concluded that the payment was made in the ordinary course of business and according to ordinary business terms. (Op. at 23, R. at 324). The Trustee, however, argues that:

This finding is clearly erroneous in light of the fact that trading in IBI's principal securities product—Chipola Stock—had been suspended by the SEC; IBI had ceased doing any securities business whatsoever because it was in violation of the Commission's net capital rule; there were rumors on the street that the SEC was going to close down IBI; both the NASD and the SEC were in IBI's offices investigating its books and records, taking depositions and interviewing IBI's principals; and SIPC liquidation had been discussed by the lawyer-defendants and the lawyer-defendants were demanding immediate payment which they instantly exchanged for cashier's checks. IBI didn't, indeed, it could not, do anything in the ordinary course of business after July 2, 1981. (Trustee's brief, at 8).

July 2, 1981 is the date when, the Trustee alleges, Greg Kearns, one of O'Connor & Hannan's attorneys, "became aware of the suspension of Chipola, which he knew was the major asset of IBI; and he was aware in response thereto, IBI had ceased operations in the securities business." (Trustee's brief, at 5).

O'Connor & Hannan assert, in response, that IBI was unable to meet net capital requirements because of the stop-trade order issued by the SEC on July 2, 1981.[9]

9. The bankruptcy court acknowledged the method employed by the SEC to declare that a company is in violation of the net capital requirement. The bankruptcy court stated:

"It is interesting to observe that all of these figures and requirements [associated with the valuation of the debtor's net capital] are predicated upon a system whereby the SEC can suspend trading for the investigation of a violation of the net capital rule, thus creating a situation where there is no ready market. Since there is no ready market, paragraph 15–c3–1 of the net capital rule [17 CFR 240.15c3–

1] requires that the stock be valued at zero. This, then, is of great aid to the SEC in supporting it [sic] contention that the organization under investigation is in violation of the net capital rule. On this basis, the SEC then continues the suspension in trading until any net capital deficiencies it has declared to exist by virtue of its own creation of 'no ready market' is [sic] replenished from other sources. This manipulative practice has apparently received the sanction of the courts and the Congress over the years." (Op. at 6, R. at 307).

Only one summary stop-trade order could be issued by the SEC without notice and a hearing. *Sloan v. S.E.C.*, 547 F.2d 152, 156–57 (2d Cir.1976). O'Connor & Hannan properly point out that at the time check #13418 was received, the stop-trade order was about to expire, and thereafter IBI would be able to meet its net capital requirement and resume trading securities. Further, the bankruptcy court's findings of fact show that IBI had sent funds payable towards past-due accounts in March and May 1981. (Op. at 9, R. at 310). Therefore, I hold that the transfer of $25,569.80, made July 10, 1981, was in the ordinary course of business and according to ordinary business terms.

The remaining element of 11 U.S.C. § 547(c)(2) is the requirement that the debt must have been incurred within 45 days of the payment. Although the bankruptcy court made detailed findings as to the time most of the debt represented by the $25,-569 payment was incurred, the court failed to mention that it was applying the 45 day limit. This 45 day time limit applies because the pre-BAFJA version of 11 U.S.C. § 547(c)(2) was in effect when the transfer at issue occurred. Therefore, the only remaining issue with regard to the $25,659.80 payment is when the 45 day period began.

O'Connor & Hannan assert that the entire amount of this payment falls within the 45 day time limit. They argue that although payment was received more than 45 days after some of the services were rendered, they received payment within 45 days after sending a statement to IBI. (O'Connor brief, at 17–18). This position, however, indicates a fundamental misunderstanding of the 45 day requirement and of the purpose behind 11 U.S.C. § 547(c)(2).

The purpose of 11 U.S.C. § 547(c)(2) is to leave normal financial transactions undisturbed. House Report No. 95–595, 95th Congress, 1st Sess. 373–374 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6329, 6330. With this purpose in mind, courts interpreting § 547(c)(2) hold that "a debt is incurred on the date upon which the debtor first becomes legally bound to pay." *In re Balducci Oil Co.,*

*Ltd.,* 33 B.R. 843, 846 (Bankr.D.Colo.1983) (citing *In re Iowa Premium Service Co., Inc.,* 695 F.2d 1109, 1111 (8th Cir.1982); *Barash v. Public Finance Corp.,* 658 F.2d 504, 512 (7th Cir.1981); and *In re Brown,* 20 B.R. 554 (Bankr.N.Y.1982)).

In this situation, IBI became legally bound to pay when the services were performed, and not when IBI received a statement. *In re Mindy's, Inc.,* 17 B.R. 177 (Bankr.S.D.Ohio 1982) does nothing to support the position taken by O'Connor & Hannan that IBI did not incur the debt for the purposes of § 547(c)(2) until they sent a statement. Any interpretation and application of *Mindy's* must be confined to its particular facts. In *Mindy's,* the debtor agreed to pay rent on commercial property assessed as a percentage of the profit earned by the debtor in the operation of a business on the leased premises. The rent became due 10 days into the month following the month for which the rent was payable. *Id.* at 179. The court held that the debtor did not incur the debt for the purposes of § 547(c)(2) until "the actual rental obligation for the prior month could be calculated and thus due under the terms of the various leases." *Id.* at 180.

In this situation, I decline to apply the *Mindy's* reasoning because the amount owed for legal services was not indeterminate until IBI received a statement from O'Connor & Hannan. Although the exact amount of the fees owed by IBI may not have been calculated immediately after O'Connor & Hannan provided the legal services, these fees were clearly calculable as they were incurred. For this reason, I hold that only the debts incurred 45 days before July 10, 1981, fall within the exception in 11 U.S.C. § 547(c)(2). Thus I conclude that the bankruptcy court erred as a matter of law when it ruled that O'Connor & Hannan were entitled to retain the entire $25,-659.80.

O'Connor & Hannan received check #13418 on July 10, 1981, and therefore the 45 day period began May 26, 1981. In the bankruptcy court's findings, "the sum of $8,146.25 was attributable to legal services rendered in June of 1981, together with

costs incurred in the amount of $71.30." (Op. at 9, R. at 310.) Therefore O'Connor & Hannan are entitled to retain $8217.55 plus whatever fees can be attributed to services rendered May 26 through May 31, 1981.

Defendant's exhibit N, introduced in the bankruptcy court adversary proceeding, consists of daily time sheets of O'Connor & Hannan, including entries for the last six days of May 1981. These time sheets show that a total of 20.5 hours were billed to IBI for the period May 26 to May 31, 1981. Further, the defendant's exhibit O is a hand-written billing analysis that sets out the hours billed by various individuals, the different hourly rates charged by each individual and the total amount of fees attributable to each individual. This analysis provides that a total of $1,675 in fees was incurred by IBI from May 26 to May 31, 1981.

■ Defendant's Exhibit H is a statement for all legal services rendered by O'Connor & Hannan to IBI in May 1981. It indicates that IBI incurred $1,879.65 in costs for various disbursements during that month. While the statement does not delineate the amount of costs incurred on a weekly or daily basis in the same manner that exhibits N and O delineate how legal fees were incurred, a figure for the period

May 26 through May 31, can be estimated. Dividing the total of $1,879.65 by twenty-one, the number of workdays in May 1981, and then multiplying by four, the number of days IBI incurred legal fees from May 26 to May 31, 1981, equals $358.03. Adding this to the $1,675 in fees gives $2,033.03 as the total amount incurred by IBI from May 26 to May 31, 1981.

■ Adding this figure to the $8,217.55 in fees and costs incurred by IBI in June 1981 equals $10,250.58 as the total amount of check #13418 that O'Connor & Hannan are entitled to retain. Because only $10,250.58 falls within the 45–day period, and therefore within the exception of § 547(c)(2), I must determine if the rest of this payment, $15,409.22, constitutes an avoidable preference under 11 U.S.C. § 547(b).[10] Section 547(b) "is intended to discourage creditors 'from racing to the courthouse to dismember the debtor during his slide into bankruptcy' and to facilitate equality of distribution." *In re Balducci Oil Co., Inc.*, 33 B.R. 843, 845 (Bankr. D.Colo.1983) (quoting HR Rep. No. 95–595, 95th Congress, 1st session at 177–178 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6138; citing *In re Martella*, 22 B.R. 649 (Bankr.D.Colo.1982)). To establish a voidable preference the Trustee

10. O'Connor & Hannan argue that the issue of whether check #13418 is a voidable preference under § 547(b) is not properly before this court because the Trustee did not specifically refer to subsection (b) of § 547 but only to § 547(c) when he designated issues on appeal. I hold that the Trustee fulfilled his obligation to designate the record by requesting the entire transcript. Bankr.Rule 8003 is modeled after Rule 10, Fed.R.App.P. In the context of Rule 10 it has been stated:

"[i]f the entire transcript is on file, or if the appellant orders the whole of it, he has no further responsibility under Rule 10(b). He need not file a designation upon the appellee and he need not serve a statement of the issues which he intends to present on the appeal." 9 *J. Moore, B. Ward & J. Lucas, Moore's Federal Practice* ¶ 210.05 (2d ed. 1985).

Furthermore, courts dealing with situations where the appellant has failed to properly designate issues on appeal have held that dismissal of the appeal is not warranted. *See Island Creek Coal Co. v. Local Union No. 1827*, 568 F.2d 7, 8 (6th Cir.1977) (holding that designating only a partial transcript for appeal did not warrant dismissal where appellees were neither misled nor prejudiced by appellant's failure to serve a statement of issues, appellees could have sought supplement to record, and there was no evidence that appellant's omission was made in bad faith); *see also In re Bienert*, 48 B.R. 326, 326–28 (N.D.Iowa 1985) (holding that an untimely designation of issues by the debtor did not warrant dismissal).

Because the Trustee designated the entire record in this matter and he raised issues concerning § 547(c), I hold that he fulfilled his duty under Bankruptcy Rule 8003. I also hold that O'Connor & Hannan will not be prejudiced by my addressing issues dealing with § 547(b). If a transfer does not fall within an exception under § 547(c) then the next logical point of inquiry is whether it is avoidable under § 547(b). Even though O'Connor & Hannan failed to brief the issue of whether check #13418 is voidable as a preferential transfer, I hold that further briefing would not materially assist my decision.

must prove all five elements of § 547(b). They are:

"any transfer of property of the debtor—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

\* \* \* \* \* \*

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under Chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title."

In this situation, check # 13418 clearly benefitted O'Connor & Hannan on account of an antecedent debt, 90 days before the filing of the SIPA liquidation. Mr. Kearns indicated that IBI had a continuous past due balance with O'Connor & Hannan throughout 1981. (Bankr.Trans. vol V, at 412–18). Therefore, the only disputed elements are §§ 547(b)(3) and 547(b)(5).

■ Based on findings of fact derived from the testimony of expert accountant witnesses (Op. at 4–8, R. at 305–09), the bankruptcy court concluded that IBI was insolvent. (Op. at 21, R. at 322). The bankruptcy court valued Chipola stock at $.19, a price it determined to be the true value of the stock when trading was suspended. The court made this finding of fact by determining that Jackson Arthur Woodruff, Jr., a NASD examiner, was the most credible of the expert witnesses who testified as to the stock's value. (Op. at 8, R. at 309). There is nothing to indicates that this is clearly erroneous.

■ It is clear that O'Connor & Hannan received more than it would have under Chapter 7 because IBI's insolvent financial condition indicates that its unsecured credi-

tors would receive a small percentage, if any, of amounts owed them.

■ The bankruptcy court also erred as a matter of law when it concluded that O'Connor & Hannan had a valid attorney's lien, as provided in Colo.Rev.Stat. § 12–5–119 (1973), on check # 13418. This statute allows an attorney a lien on the property, including money, of a client, that comes into the attorney's possession, in order to secure payment of funds owed to the attorney. *See In re Ranes*, 31 B.R. 70, 72 (Bankr.D.Colo.1983) ("[t]he statute grants attorneys two types of liens: (1) a possessory lien on all the papers of his client in his possession; and (2) a 'charging lien' on any judgment he may have obtained"); *In re Storage Tech. Corp.*, 45 B.R. 363, 364 (D.Colo.1985) (quoting *Ranes*, at 72); *Donaldson, Hoffman & Goldstein v. Gaudio*, 260 F.2d 333, 335 (10th Cir.1958) (interpreting the statutory predecessor to Colo.Rev.Stat. §§ 12–5–119 & 12–5–120).

In the instant case, the money came directly from the client IBI to pay a debt. It did not come from a third source, such as the proceeds of a settlement, as contemplated by the statute. To adopt the bankruptcy court's logic would require me to hold that O'Connor & Hannan had an attorney's lien **before** they actually had possession of the check. This is clearly not the type of lien intended by Colo.Rev.Stat. § 12–5–119 (1973). *Cf. In re Oiltech, Inc.*, 38 B.R. 484, 487 (Bankr.D.Nev.1984) (holding that a law firm, possessing $7,000 owed to its client when compensable work had been completed, was entitled to a retaining or possessory lien). Other courts have not hesitated to set aside transfers as avoidable preferences where a debtor has transferred funds to an attorney on the eve of bankruptcy. *See In the matter of Darke*, 18 B.R. 510, 513–14 (Bankr.E.D.Mich.1982). Therefore, $15,409.22 of check # 13418 falls within the trustee's avoidance power as a preferential transfer.

Payment of $11,858 to Gilbert K. Davis—Check # 13417.

■ With regard to the payment of $11,858 to Gilbert K. Davis, the bankruptcy court stated:

"[t]he evidence convinces me that all of the services rendered by Davis and by Davis, Gillenwater & Lynch were in contemplation of or in connection with the SIPA case and its anticipated filing. Accordingly, [11 U.S.C ] § 329 of the Code is applicable, and Davis has failed to establish compliance with that section. This destroys any possible exception to avoidance under § 547(c)(2). Further, most, if not all, of the representation provided by Davis and Davis, Gillenwater & Lynch was for individuals and not for IBI." (Op. at 23–24, R. 324–25.)

The court therefore concluded that this payment was an avoidable preference under 11 U.S.C. § 547(b). Because I do not find the bankruptcy court's findings to be clearly erroneous, I confirm that court's legal conclusion that failure to comply with 11 U.S.C. § 329 destroyed any exception to avoidance under § 547(c)(2).

■■■■■ Further, I hold that the bankruptcy court's conclusion that the payment reflected in check # 13417 did not constitute a contemporaneous exchange of value is valid. As stated earlier, a client becomes legally obligated to pay as soon as services are rendered; if payment is received after the debt is incurred, this is payment of an antecedent debt. *See In re Balducci, supra,* at 845–46. Here, payment was of an antecedent debt because representation by the Davis defendants commenced before they received check # 13417.

■■■■ The $11,858 payment can also be avoided because the Davis defendants were retained to resist the liquidation of IBI. *See SEC v. Alan F. Hughes, Inc.,* 481 F.2d 401, 402–03 (2d Cir.1973) (court voided transfer of fees to attorneys hired to resist appointment of trustee to commence liquidation of broker-dealer). *Accord SEC v. Capital Counsellors, Inc.,* 378 F.Supp. 224, 226 (S.D.N.Y.1974) (legal fees paid counsel to oppose application for liquidation held not payable from assets of receivership estate). In summary, check # 13417 was neither a contemporaneous exchange of value under § 547(c)(1) nor properly payable from the estate of a securities trader undergoing liquidation. Therefore,

this payment constitutes an avoidable preference under § 547(b).

### Payment of $25,000 to the Davis Defendants—Check # 13432.

■■■■ The Davis defendants also challenge the bankruptcy court's conclusion that the payment of $25,000 reflected in check # 13432 was voidable as a fraudulent transfer under 11 U.S.C. § 548(a)(2). (Op. at 27, R. at 328). In order for § 548(a)(2) to apply, the trustee must be establish that:

(1) A transfer of an interest of the debtor in property occurred;

(2) The transfer occurred within one year of the bankruptcy filing;

(3) The debtor received less than a reasonably equivalent value in exchange for the transfer; and

(4) The debtor was insolvent on the date of the transfer.

*See In re Ears, Nose & Throat Surgeons of Worcester, Inc.,* 49 B.R. 316, 319 (Bankr. Mass.1985).

■■■■ Here, a transfer clearly occurred within one year of the liquidation petition. I confirm the bankruptcy court's conclusion that IBI was insolvent at the time this transfer occurred. Therefore, the only remaining element is whether IBI received less than a reasonably equivalent value in exchange.

The bankruptcy court concluded that an equivalent exchange did not occur. (Op. at 25–26, R. at 326–27). This conclusion was warranted for several reasons. First, the Davis defendants failed to allow the court to pass upon the reasonableness of the attorney's fees, as intended by 11 U.S.C. § 329. Second, they failed to allow the court to approve all legal representation, as intended by 11 U.S.C. § 327. Third, as previously stated, representation by the Davis defendants was at least in part for the benefit of individual directors of IBI, rather that IBI. Fourth, legal fees may not properly be paid from the estate to resist a liquidation petition. For these reasons, I uphold the bankruptcy court's conclusion that IBI received less than equivalent value for the $25,000 payment, and

therefore conclude that check #13432 was voidable as a fraudulent transfer.

Accordingly, IT IS ORDERED that:

(1) The bankruptcy court's decision of December 10, 1985 is affirmed in part and reversed in part;

(2) The portion of the bankruptcy court's decision holding that BAFJA repeals the removal section of SIPA, 15 U.S.C. § 78eee(b)(4) is reversed;

(3) The bankruptcy court's ruling that the entire payment of $25,659.80 in check #13418 to O'Connor & Hannan fell with the exception to the trustee's avoidance power in 11 U.S.C. § 547(c)(2) is reversed;

(4) O'Connor & Hannan are entitled to retain $10,250.58 of check #13418 because this portion falls within the exception in 11 U.S.C. § 547(c)(2);

(5) O'Connor & Hannan must relinquish the remaining portion of check #13418, $15,409.22, because it constitutes a voidable preference under 11 U.S.C. § 547(b);

(6) The bankruptcy court's ruling that the payment of $11,858 to the Davis defendants in check #13417 constituted a preferential transfer under 11 U.S.C. § 547(b) is affirmed; and

(7) The bankruptcy court's ruling that the payment of $25,000 to the Davis defendants in check #13432 constituted a fraudulent transfer under 11 U.S.C. § 548(a)(2) is affirmed

Each party shall bear his or its own costs.

## ON MOTION TO AMEND AND SUPPLEMENT

On October 5, 1989, this Court entered an Order and Judgment ruling: (1) that the bankruptcy court has jurisdiction over the above-captioned proceeding; (2) that $15,409.22 of check #13418 paid to O'Connor and Hannan constituted a voidable preferential transfer; (3) that the entire amount of check #13417 paid to the Davis defendants constituted a voidable preferential transfer; and (4) that the entire amount of check #13432 paid to the Davis defendants constituted a voidable fraudulent transfer. Presently pending is the trustee's, James H. Turner ("Trustee"), motion to amend and supplement the order and judgment pursuant to Rule 59(e), Fed.R.Civ.P.[1] O'Connor & Hannan have responded by opposing the motion.

In his motion to amend, the Trustee seeks prejudgment interest on the amounts set aside by this court pursuant to 11 U.S.C. § 547(b) and § 548(a)(2) as preferential and fraudulent transfers. The Trustee asserts that when a transfer is set aside, "the trustee is entitled to pre-judgment interest thereon from the earlier of the date on which demand is made for the return of the preference or the commencement of the adversary proceeding." (Trustee's motion to amend, at 2 citing *In re Baker & Getty Financial Services, Inc.,* 88 B.R. 792, 800 (Bankr.N.D. Ohio 1988); *In re Independent Clearing House Co.,* 41 B.R. 985, 1015 (Bankr.D.Utah 1984) *rev'd on other grounds,* 60 B.R. 985 (D.Utah 1986)).

In opposition, O'Connor & Hannan assert that the Trustee is not "entitled" to prejudgment interest; rather, it is allowed only within the discretion of the trial court. (O'Connor & Hannan's response, at 3 citing *In re Frigitemp Corp.,* 781 F.2d 324, 325 (2d Cir.1986); *In re Art Shirt Ltd., Inc.,* 93 B.R. 333 (E.D.Pa.1988); *In re Four Seasons Sporting Goods, Inc.,* 46 B.R. 528 (Bankr.N.D.Cal.1985); *In re Roco Corp.,* 37 B.R. 770, 774 (Bankr.D.R.I.1984)). Because the bankruptcy court and this court remained silent on the issued of prejudgment interest, O'Connor & Hannan conclude that neither court intended to award such interest. Therefore, O'Connor & Hannan seek an order denying the motion to amend and supplement the order and judgment.

*In re Independent Clearing House Co.,* 41 B.R. 985, 1015 (Bankr.D.Utah 1984) *rev'd on other grounds,* 60 B.R. 985

---

1. Rule 59(e) provides: "[a] motion to alter or amend the judgment shall be served not later than 10 days after entry of judgment." The

Trustee complied with Rule 59(e) by filing his motion to alter or amend the judgment on Monday, October 16, 1989.

(D.Utah 1986) addressed the subject of prejudgment interest. The court there stated:

"[t]he Bankruptcy Code itself is silent on the subject [of the availability of prejudgment interest in actions to recover preferential and fraudulent conveyances]. However, Collier suggests that, as under prior law, the bankruptcy court should exercise its equitable powers to award the trustee interest and costs. 4 *COLLIER ON BANKRUPTCY* ¶ 550.02, at 550–56 (15th ed. 1984). Ordinarily, the allowance of prejudgment interest and the fixing of the time from which interest shall accrue are discretionary with the court.

An award of prejudgment interest is not punitive but compensatory, and is allowed where necessary to make the prevailing party whole....

It is well settled that in an action to set aside a preference the trustee is entitled to prejudgment interest from the date of demand for its return, or, in the absence of a prior demand, from the date of commencement of the adversary proceeding....

The allowance of interest from the date demand is made or a proceeding instituted, rather than the date of the transfer, is based on the idea that until such time the preferred creditor cannot be said to hold the property wrongfully." *Id.* at 1015 (citations omitted).

█ In support of his contention that a trustee is entitled to prejudgment interest, the Trustee cites *In re Baker & Getty Financial Services, Inc.,* 88 B.R. 792, 800 (Bankr.N.D.Ohio 1988) and *In re Independent Clearing House Co., supra.* As the above quoted language reveals, these cases hold that a trustee is "entitled to prejudgment interest from the date of demand for its return, or, in the absence of a prior demand, from the date of commencement of the adversary proceeding." As a threshold matter, however, the overall authority to allow such recovery is within the discretion of the trial court.

In the instant action, the bankruptcy court ruled that the transactions at issue were preferential or fraudulent only after determining that it did not have jurisdiction to decide the entire dispute. (Maj. op., at 1018). That court did not address whether the Trustee was entitled to prejudgment interest, apparently because of its determination that it lacked subject matter jurisdiction over the entire liquidation.

█ The cases cited by the Trustee reveal a clear trend to award prejudgment interest to a trustee who successfully overturns preferential and fraudulent transactions. This trend leads me to conclude that the bankruptcy court abused its discretion by remaining completely silent on this issue. Because the Trustee was entitled to set aside the preferential and fraudulent conveyances specified in the October 5, 1989 order, the bankruptcy court should have decided the prejudgment interest issue. I remand the case to the bankruptcy court for that decision.

Payment of $25,000 to O'Connor & Hannan—Check # 13419.

The Trustee also seeks an amendment to the October 5, 1989 order upholding the bankruptcy court's determination that the $25,000 payment to O'Connor & Hannan, reflected in check # 13419, constituted a voidable fraudulent transfer. Because my October 5, 1989 order specifically mentioned those portions of the bankruptcy court's order that were modified, portions not mentioned were by implication upheld. Nonetheless, in the interests of clarity, I affirm the bankruptcy court's conclusion to set aside the transfer of check # 13419 as a fraudulent conveyance under 11 U.S.C. § 548(a)(2).

For the reasons set forth above, the issue of whether the Trustee is entitled to prejudgment interest on check # 13419 is also remanded to the bankruptcy court.

Accordingly, IT IS ORDERED that:

(1) the bankruptcy court's opinion setting aside the payment of $25,000 to O'Connor & Hannan, reflected in check # 13419, as a fraudulent conveyance, is affirmed;

(2) the issue of the Trustee's entitlement to prejudgment interest on all amounts

set aside is remanded to the bankruptcy court;

(3) the bankruptcy court is ordered to make specific findings as to whether the Trustee is entitled to prejudgment interest on the amounts set aside and to conduct a hearing on that issue if deemed necessary; and

(4) the bankruptcy court is also ordered to make specific findings as to whether the Trustee is entitled to costs and attorneys' fees.

Each party shall bear his or its own costs.